Filed 4/13/23

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074429 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN365966) |
| DANIEL MANUEL RAMOS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Judgments reversed in part, sentences vacated, and remanded with directions.

Cynthia A. Grimm, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Manuel Ramos.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Elias Isai Ramos.

---

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II.A-C, D.4-D.7, E-S of the Discussion.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Daniel Rogers and Matthew Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

In a joint trial involving a gang shooting, a jury convicted Daniel Ramos (Daniel) and Elias Ramos (Elias) of first degree murder (Pen. Code, § 187, subd. (a))[1] (count 1); attempted first degree murder (§§ 187, subd. (a), 189, 664) (count 2); and possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3). The jury also made true findings on firearm and gang enhancements. (§§ 12022.53, subds. (c), (d), (e)(1), 186.22, subd. (b)(1).) The court sentenced Daniel (the shooter) to an aggregate prison term of 92 years to life and Elias (the aider and abettor) to 84 years to life.

Daniel and Elias appealed, raising over 30 issues. Many involved the admissibility of a confession and incriminating statements Daniel made while in custody on unrelated charges to a confidential informant (CI) posing as a gang member. Defendants also asserted the trial court erred in admitting evidence of (1) rap videos performed by Elias, and (2) certain expert testimony regarding gangs. Both also asserted prosecutorial misconduct and sentencing errors, and they joined in each other's challenges.

We originally issued an opinion on December 28, 2020, addressing all of the issues raised by defendants and affirming the judgments. Our Supreme Court subsequently granted Daniel and Elias's petitions for review and held the matter pending its eventual decision in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). On April 20, 2022, after *Tirado* issued, the matter was

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

2

transferred back to us with directions to vacate our decision and reconsider the cause in light of *Tirado*. After receiving supplemental briefing, we vacated our 2020 opinion, and we issued an opinion on October 20, 2022 which affirmed in part, reversed in part, and remanded for further proceedings. Daniel and Elias each filed a petition for review, and on December 28, 2022, our Supreme Court issued an order directing us to vacate our October 20, 2022 decision and to reconsider the cause in light of Assembly Bill No. 2799 (Stats. 2022, ch. 973), which enacted Evidence Code section 352.2. On January 5, 2023, we vacated our October 20, 2022 opinion. The parties have filed supplemental letter briefs addressing Evidence Code section 352.2.

In their first round of supplemental briefing (filed after our Supreme Court's April 20, 2022 order), in addition to addressing the impact of *Tirado*, *supra*, 12 Cal.5th 688, Daniel and Elias argued that they are entitled to relief based on several statutory enactments that took effect after our original opinion. Those statutory enactments consist of the following: (1) a change to the substantive requirements for finding a gang enhancement pursuant to section 186.22, subdivision (b); (2) the enactment of section 1109, which requires that a bifurcated trial be held regarding gang enhancements alleged under section 186.22; (3) amendments to the determinate sentencing law that constrain the trial court's discretion to impose an upper term sentence and create a presumption of a lower term sentence for youthful offenders (§ 1170, subd. (b)); and (4) an enactment vacating the imposition of any unpaid criminal justice administration fee imposed pursuant to former Government Code section 29550.1 (Gov. Code, § 6111, subd. (a)). In their second round of supplemental briefing (filed after our Supreme Court's December 28, 2022 order), Daniel and Elias argued that Evidence Code section 352.2 should

apply retroactively, and that under the new provision, the trial court erred in admitting evidence of videos depicting Elias singing rap lyrics.

With two exceptions, the People agree that the new enactments identified by Daniel and Elias apply retroactively because the convictions are not yet final. The People do not agree that section 1109, which requires the bifurcation of the trial of gang enhancements, is to be applied retroactively. As we will explain, we need not reach that issue. Any error in trying the gang enhancements together with the substantive offenses was harmless error because the vast majority of the gang evidence was admissible to prove motive, identity, and premeditation for the substantive offenses. Also, the People take the position that Evidence Code section 352.2 does not apply retroactively to cases that have already been tried. We agree with that assessment. Evidence Code section 352.2 does not apply and presents no reason for us to alter the disposition set forth in our now-vacated October 20, 2022 opinion.

As we explained in that opinion, as a result of statutory amendments to section 186.22, the true findings on the gang enhancement allegations as to both Daniel and Elias in counts 1, 2, and 3 must be reversed, as well as the true finding on the firearm enhancements for Elias in counts 1 and 2, which depend on the true finding on the gang enhancements. The People may choose to retry the gang enhancement allegations on remand. As a result of the new enactments identified in the supplemental appellate briefing, the following components of the sentences imposed by the trial court are not legally permissible based on the current record: (1) For Elias, (a) the 25-year-to-life sentence for the firearm enhancement in count 1; (b) the 20 year sentence for the firearm enhancement in count 2; (c) the four-year sentence for the gang enhancement in count 3; (d) the upper term three-year sentence

on count 3; (e) the $154 fee imposed under former Government Code section 29550.1, to the extent it remains unpaid; and (2) for Daniel, (a) the 15-year-to-life sentence on count 2, which must be reduced to a sentence of seven years to life, absent a legally permissible finding on the gang enhancement for that count; (b) the four-year sentence for the gang enhancement in count 3; (c) the upper term three-year sentence on count 3; and (d) the $154 fee imposed under former Government Code section 29550.1, to the extent it remains unpaid. As part of a full resentencing hearing, the trial court may also consider with respect to the firearm enhancements imposed on Daniel in counts 1 and 2, whether to exercise its discretion, as described by *Tirado*, *supra*, 12 Cal.5th 688 to impose lesser firearm enhancements.

In all other respects, the judgments are affirmed.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Center Street and Posole Gangs*

Daniel and Elias (no relation) are members of Center Street, a criminal street gang in Oceanside. Daniel's gang moniker is Kieto. Elias's is Blue.

Center Street, which has about 70 members, engages in murder, assault with a deadly weapon, robbery, vandalism, and unlawful possession of firearms. Posole, with about 100 members, is a rival gang claiming other Oceanside territory.

A gang expert testified that murdering a gang rival achieves the highest form of respect within a gang, and even being present to provide backup and to corroborate what occurred bolsters a gang member's status "just the same."

5

In 2016, Annebell F. was 15 years old and lived in the Posole neighborhood.[2] She often spent late hours at Balderrama Park (Park), the centerpiece of Posole territory. Annebell was not a gang member. However, her close friend, Julye R. was.

B.    *The Shooting*

About 2:00 a.m. on September 3, Julye went to the Park after a family argument. By coincidence, Annebell was already there. The two friends talked near the jungle gym.

The Park is a five-minute walk from the area of Interstate 5 at the Mission Avenue on-ramp. On September 3 at about 2:00 a.m., a nearby resident heard rattling from a chain link fence. Looking out a window, he saw one person climbing the fence and another who was already on the other side. Both were wearing dark hoodies, and one wore a white bandanna covering his face.

Two people walked into the Park, standing side-by-side, each wearing a dark hoodie and a bandanna face covering. One of them began shooting. Julye ran for his life. Annebell hid in the jungle gym's crawl tube.

Another nearby resident heard about seven gunshots and saw two men running away. One wore a black hoodie and a white bandanna covering his face. The other wore a hoodie with a black bandanna. Because gunshots are so common in that neighborhood, he did not call the police.

At about 2:35 a.m., Oceanside police found Annebell dead inside the crawl tube, which had .22-caliber bullet holes. Unspent .22-caliber bullets were on the ground nearby.

---

[2]    Dates are in 2016 unless otherwise specified.

C.  *Police Surreptitiously Record Julye Identifying Daniel as the Shooter*

Julye refused to cooperate with law enforcement.[3]  However, on September 15, he was in custody on an unrelated matter.  So was Jose "JoJo" F.—Annebell's brother.  Police placed Julye and JoJo in the same cell and secretly recorded their conversation, which was played for the jury.  Because JoJo was in custody when Annebell was killed, this was their first contact since the shooting.

Julye told JoJo that he was "targeted" by "Kiets," i.e., Kieto, Daniel— who was armed with a revolver and pulled down his bandanna before shooting so that Julye could see his face.  Julye said that Daniel was with "the short fool,"[4] who wore a bandanna over his face.[5]

D.  *Cell Phone Records and Rap Videos*

On September 15, police arrested Elias for violating probation in an unrelated matter and obtained his phone.  On the day of the shooting, Elias's phone received a call at 1:23 a.m. and had no activity again until 3:11 a.m., when it received a call from Center Street gang member David R.  At noon the same day, the user of Elias's phone searched Facebook for "Balderrama Park," and "Oceanside teen girl shot to death."  At 8:42 p.m., Elias's phone was used to search for Annebell's Facebook account.  Later that night, Elias's phone was used to search the internet for "teenager killed in Oceanside."

---

[3]  Testifying against even a rival gang member violates gang norms.

[4]  Elias, at five feet four inches tall, is two inches shorter than Daniel.

[5]  At trial, Julye recanted these statements, testifying that he fabricated the story because Annebell's family was pressuring him to identify the shooter.

7

Elias's phone also contained a video of him singing rap.  This led police to similar YouTube videos.  In general, the rap videos, which the jury watched, identify Elias and Daniel as Center Street gang members who, among other things, were seeking to kill Posole rivals.

E.    *Daniel and Elias's Jail Conversation*

On September 21, Daniel was also in custody on unrelated probation violations.  With both Elias and Daniel in custody, police staged a ruse—a lineup in which two "witnesses" identified Elias and Daniel as the shooters.  After the lineup, police placed Daniel and Elias in the same cell and surreptitiously videoed their conversation, which was played for the jury.

Elias detected the camera and pointed it out to Daniel.  After whispering to each other for about 11 minutes, they began to speak audibly.  Daniel told Elias that he "got down" (i.e., got in a fistfight) with "Boxer," who had heard that Daniel "pulled that and shit."  "Boxer" is the gang moniker of Hector F., Jr., a Posole gang member and Annebell's cousin.  Daniel said that Boxer confronted him stating, "That's my cousin" and asked, "Were you out there or what?"  Daniel's reply, "Shit happens, fool," angered Boxer, who later assaulted Daniel in jail.  Apparently concerned about the hidden camera, Elias said to Daniel, "Delete that shit, fool."

F.    *Daniel's Confession to the CI*

1.    *Part 1 - Before Garcia Entered*

Marko Garcia is a police officer with extensive gang experience.  Investigating this case, Garcia worked with an ex-gang member, now a paid police informant, identified at trial only as the CI.  The CI, dressed as an inmate and wearing a concealed audio recording device, was placed in a 28-by 28-foot holding or rebooking cell.  Police moved Daniel to the same cell.  Other inmates, not part of the operation, were in and out at various times.

8

The encounter between Daniel and the CI spanned about five hours; a large part was played for the jury.

The CI portrayed himself as an older and experienced gang member who had spent the last 10 years in prison for killing. After Daniel introduced himself as "Kieto, Center Street Gang," the CI talked about several Center Street gang members. Daniel replied, "I've heard of 'em."

Daniel said little during the first hour. The CI reminisced about times past, when police mostly left rival gang members alone so long as they only assaulted each other. He lamented that "it's different now dog." Eventually, the CI said to Daniel, "Hey dog . . . —your barrio—you guys are over there by Tri-City?" Daniel replied, "Oceanside."

2. *Part 2 - Garcia's Entrance*

After about 75 minutes, Detective Garcia, dressed as an inmate and posing as a gang member, entered. He and the CI pretended to be old friends. They talked about advice the CI gave to Garcia years ago to conceal evidence of a murder. This was all staged for Daniel's consumption.

3. *Part 3 - Daniel and the CI*

Garcia left the cell after about 41 minutes. The CI told Daniel that if Garcia followed his instructions about concealing the evidence, the police wouldn't be able to tie Garcia to the murder. The CI asked Daniel, "You got that little feeling that it's something bad?" Daniel replied, "I already know it is."

Daniel told the CI that he and his "homie" were identified in a lineup. After the CI replied that nighttime identifications can be easily discredited in court, Daniel stated, "It was at night."

Daniel told the CI that he and his homie did "a hot one," i.e., a murder that occurred around 2:00 a.m. at a park. The CI asked, "Did you guys use a

9

revolver or was it a semi-automatic?" Daniel replied, "Revolver." He explained that they drove in "the homie's car," but "hopped off and walked it." Daniel was concerned that police might find the clothes he was wearing, which on the night of the murder he threw out of a car.

4. *Part 4 - CI "Charged" with Murder*

At this point, an officer removed the CI from the cell, stating he was being taken to meet with detectives regarding "an old murder from 2002." Returning later, the CI told Daniel, "They got me on a hot one . . . ." The CI and Daniel therefore had something else in common.

5. *Part 5 - The Fake Grand Jury Indictment*

Handing Daniel what appeared to be a grand jury indictment, detectives entered the cell and said he was being charged with Annebell's murder. The indictment was a ruse; there was no grand jury.

After the detectives left, Daniel told the CI, "I'm charged for murder, dog." The CI read part of the indictment alleging that Daniel and Elias killed Annebell. The CI said, "Why a fuckin' jaina [girl]? You guys mercked [murdered] a jaina? You guys mercked a jaina?"[6] Daniel replied that Annebell was "gay"—apparently meaning that she was dressed in clothing ordinarily worn by males and they mistook her for a Posole gang member.[7]

Reading more of the fake indictment, the CI stated that Elias was also being charged. Daniel replied, "That's my . . . homie." In response to the CI's question, "Who'd you guys get?" Daniel replied, "Posole."

---

[6] Killing a girl violates gang norms.

[7] In closing argument, the prosecutor explained, "[Daniel is] not saying that he killed her because she was actually gay. The way he articulates himself is I couldn't tell the difference between her being a guy or a girl."

10

Daniel also told the CI that Elias was unarmed and was there "to ride with [him]." When the CI asked, "What kind of fusca [gun] did you have?" Daniel replied, "A fuckin' .22."

Before being removed from the cell, the CI asked, "What's your homeboy's name in case I run into him . . . . ?" Daniel replied, "Call him Blue."

G.    *Daniel and Elias Are Jointly Tried*

An amended information charged both Daniel and Elias with three counts:  (1) murder (§ 187, subd. (a)); (2) attempted premeditated murder (§§ 187, subd. (a), 189, 664); and (3) possession of a firearm by a felon (§ 29800, subd. (a)(1)).  As to all three counts, it was alleged that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang, and with the specific intent to promote, further, and assist in criminal conduct by gang members.  (§ 186.22, subds. (b)(1), (b)(5).)  As to the murder and attempted murder counts, the amended information also alleged that Daniel and Elias had either intentionally and personally discharged a firearm or participated in an offense in which another principal personally and intentionally discharged a firearm, and in the case of the murder count, causing great bodily injury or death.  (§ 12022.53, subds. (c), (d), (e)(1).)

Daniel and Elias were jointly tried before the same jury.

H.    *Defense Case*

At trial, the defense rested without offering evidence.  In closing argument, defense counsel emphasized the lack of forensic evidence and that the only eyewitness, Julye, lacked credibility.  Counsel argued that Daniel's confession was not credible because Daniel was "mirroring" what the apparent elder gang member said.  Elias's attorney argued that the CI was a

11

"chatterbox" and the only way Daniel could silence him was to respond with incriminating statements. Counsel argued the rap lyrics depicted only fiction.

I.     *Conviction and Sentence*

The jury found both Daniel and Elias guilty of first degree murder, attempted premeditated murder, and possession of a firearm by a felon. The jury also made true findings on the firearm and gang enhancements, as alleged in the amended information.[8] The trial court imposed an aggregate prison sentence of 92 years to life for Daniel and 84 years to life for Elias.

Daniel's prison term was comprised of (1) 25 years to life for the first degree murder count; (2) 25 years to life for the firearm enhancement for that count (§ 12022.53, subd. (d)); (3) 15 years to life for the attempted murder count;[9] (4) 20 years for the firearm enhancement for that count (§ 12022.53, subd. (c)); (5) an upper term sentence of three years for the conviction of

---

[8]     In counts 1 and 2, with respect to both Elias and Daniel, the jury made true findings on firearm allegations pursuant to section 12022.53, subdivision (e)(1). An enhancement under subdivision (e)(1) requires a finding that the defendant was a *principal* in a crime, *but not necessarily the shooter*, and the jury must make a predicate true finding on the gang enhancement in section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1).) With respect to Daniel, the jury also made true findings in counts 1 and 2 based on section 12022.53, subdivisions (c) and (d), premised on Daniel being the actual shooter. An actual shooter is subject to a firearm enhancement under subdivisions (c) or (d) without a true finding on a gang enhancement.

[9]     The sentence on the attempted murder count for Daniel was increased from a term of seven years to life to a term of 15 years to life based on the gang enhancement in section 186.22, subdivision (b)(5), which provides that, with certain exceptions, "a person who violates this subdivision [i.e., section 186.22, subdivision (b)] in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

possession of a firearm by a felon; and (6) an upper term sentence of four years for the gang enhancement on that count.

Elias's prison term was comprised of (1) 25 years to life for the first degree murder count; (2) 25 years to life for the firearm enhancement for that count (§ 12022.53, subds. (d), (e)(1)); (3) seven years to life for the attempted murder count; (4) 20 years for the firearm enhancement for that count (§ 12022.53, subds. (c), (e)(1)); (5) an upper term sentence of three years for the conviction of possession of a firearm by a felon; and (6) an upper term sentence of four years for the gang enhancement on that count.

## II.

## DISCUSSION

A.    *The Trial Court Did Not Err in Admitting Daniel's Confession*

1.    *Introduction*

Daniel contends that the trial court prejudicially erred in admitting his confession.  His argument encompasses three distinct issues:  (1) The Fifth Amendment right regarding self-incrimination under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) the Sixth Amendment right to counsel under *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*) because the confession was elicited without counsel's presence; and (3) due process rights precluding an involuntary confession.

Elias also challenges the admissibility of those portions of Daniel's confession that incriminated him.  Moving for a separate trial, Elias asserted that because Daniel would not be testifying, this evidence (1) violates Elias's rights under the confrontation clause of the Sixth Amendment, citing *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*); and (2) is inadmissible hearsay.

13

2.	Miranda *Admonishments Were Unnecessary Because Questioning Was Conducted by One Believed to be a Fellow Inmate*

"*Miranda* does not protect suspects when they describe criminal activities to people they think are cellmates. [Citation.] Rather, *Miranda* addressed concerns that a 'police-dominated atmosphere' generates 'inherently compelling pressures' that 'undermine the individual's will to resist' questioning. [Citations.] Those concerns evaporate when, as here, an inmate speaks freely to someone he believes is a fellow inmate." (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 198 (*Rodriguez*).) Accordingly, "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." (*Illinois v. Perkins* (1990) 496 U.S. 292, 300 (*Perkins*).)

For example, in *People v. Webb* (1993) 6 Cal.4th 494, a suspect made incriminating statements to an acquaintance who, unbeknownst to him, was working with police and wore a concealed audio recording device. (*Id.* at pp. 509, 525.) Our Supreme Court stated that " '[c]oercion is determined from the perspective of the suspect,' " and "[f]rom [the] defendant's perspective, he was talking with a friend . . . ." (*Id.* at p. 526.) Holding there was no custodial interrogation triggering *Miranda*, the Court concluded the recordings were admissible despite the absence of *Miranda* warnings. (*Webb*, at p. 526.)

Here, Daniel confessed to someone he believed to be an incarcerated gang member who, like him, was facing a murder charge. No *Miranda* advisements were required before the CI elicited the confession.

3.	*No Sixth Amendment Right to Counsel Had Attached*

*Massiah*, *supra*, 377 U.S. at page 206, holds that the government violates a defendant's Sixth Amendment right to counsel by introducing in

14

evidence incriminating statements made (1) without counsel; and (2) after commencement of criminal proceedings.

However, the Sixth Amendment right to counsel " 'does not exist until the state initiates adversary judicial criminal proceedings, such as by formal charge or indictment.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 161 (*Fayed*).) This rule derives in part from the text of the Sixth Amendment, which requires the existence of both a "criminal prosecution" and an "accused." (*United States v. Gouveia* (1984) 467 U.S. 180, 188 (*Gouveia*).) The right to counsel attaches at the initiation of adversary judicial criminal proceedings because "[i]t is only at that time 'that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " (*Id*. at p. 189.)

Daniel made incriminating statements to the CI before being charged in this case. Accordingly, Daniel had no Sixth Amendment right to counsel when questioned by the CI about these crimes. (*People v. Woods* (2004) 120 Cal.App.4th 929, 939-941 [no *Massiah* violation in using informant to elicit incriminating statements at investigatory stage before charges were brought].)

Moreover, with respect to his Sixth Amendment right to counsel, it makes no difference that Daniel was in custody on an unrelated probation violation and was represented by counsel in such proceedings. This is because "the Sixth Amendment right to counsel is 'offense specific'; it arises and may be asserted only as to those offenses for which criminal proceedings have formally begun. [Citations.] A defendant's incriminating statements about offenses for which he has not been charged may be admitted

15

consistently with his Sixth Amendment counsel guarantee notwithstanding its attachment on other charged offenses at the time." (*People v. DePriest* (2007) 42 Cal.4th 1, 33.)

    4.    *No Due Process Violation*

An involuntary confession obtained through coercive police tactics is inadmissible under the due process clauses of the federal and state Constitutions. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) " ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " (*Ibid*.) "We judge whether a confession was involuntary by examining the totality of [the] circumstances surrounding the confession." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 819.) Although the ultimate issue of the voluntariness of a confession is subject to independent review, the appellate court defers to the trial court's factual findings if supported by substantial evidence. (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

" 'The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement.' " (*Fayed*, *supra*, 9 Cal.5th at p. 165.) "In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*People v. Smith* (2007) 40 Cal.4th 483, 501 (*Smith*).)

Here, the trial court listened to the entire recording of Daniel's conversation with the CI. Rejecting Daniel's assertions, the court stated, "I would also note from my own listening to the tape that the tone and inflection of the CI's voice and Daniel's voice that there was nothing that in any way

16

suggested that Daniel was in some way intimidated into saying what he did to the CI. The CI's voice was calm. . . . [Daniel spoke] of his own free will."

The trial court also conducted a hearing outside the jury's presence to determine if the recording was trustworthy. Detective Garcia testified that the CI could not turn the recorder on or off—only police personnel knew how to do that. The court found that the recording was continuous, the CI did not intimidate Daniel, and Daniel spoke voluntarily.

We have listened to the recording and agree with the trial court's findings. The CI consistently spoke in a calm voice, sometimes even whispering. Nothing in Daniel's words or tone indicated he felt coerced or intimidated. He simply fell for the deception.

5. *Daniel's Contentions*

a. *Deliberate Delay in Charging*

Daniel contends "there was enough evidence to charge [him] with the shooting[ ], well before the October 25 undercover operation." He asserts that the People "deliberately delayed" filing charges so as to not trigger his right to counsel under *Massiah, supra,* 377 U.S. 201, thus violating his due process rights and right to counsel.

Daniel's argument fails for two reasons. Whether there was "enough evidence" to charge him with Annebell's murder before the undercover operation is questionable. There was no forensic evidence linking Daniel to the crimes. The only eyewitness, Julye, was a rival gang member who at trial recanted his prior identification. Prosecutors are not constitutionally obligated to file charges as soon as they have probable cause but before they believe that they can establish guilt beyond a reasonable doubt and while investigation is ongoing. (*Gouveia, supra,* 467 U.S. at p. 192, fn. 7.)

17

Second, even assuming that there was some intentional delay in charging, that does not render Daniel's confession inadmissible. The California Supreme Court rejected a similar contention in *Fayed*, *supra*, 9 Cal.5th at page 163. There, the defendant's wife was murdered on July 28, 2008. The next day, police arrested the defendant for her murder. But after invoking his right to remain silent, he refused to speak to investigators and was released. (*Id*. at p. 160.) Three days later, defendant was arrested on unrelated federal charges. Still in federal custody about a month later, the defendant told his cellmate that he paid someone to murder his wife. Unbeknownst to the defendant, the cellmate was wearing a concealed recording device. (*Id*. at p. 157.) The jury heard the recorded confession and convicted the defendant of murder. (*Id*. at pp. 157-158.) On appeal, the defendant claimed that police intentionally delayed charging him with murder so they could extract a confession before his right to counsel attached. (*Id*. at p. 161.) Rejecting this argument, the Court stated, "even if state authorities deliberately delayed arresting defendant for Pamela's murder, which purportedly gave them more time in which to elicit defendant's incriminatory statements in federal custody, this 'conscious delay' does not violate his Sixth Amendment right to counsel." (*Fayed*, at p. 163.)[10]

---

[10] The statute of limitations protects a defendant from prejudice caused by a deliberate delay in charging. Moreover, "the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." (*Gouveia*, *supra*, 467 U.S. at p. 192.) " ' "[P]rejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." ' " (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 757.)

b.    Miranda *Violation*

Daniel asserts that when initially questioned by police, he was read his *Miranda* rights and asked if he understood them, but not asked if he waived them.  In that interview, Daniel denied any involvement in the shooting.  On appeal, Daniel contends that in so doing, he "essentially" invoked his right to remain silent.  Daniel asserts, therefore, that he should not have been subject to "further interrogation on the shooting, because he never affirmatively waived his constitutional right to silence or counsel."

The record does not contain a transcript of this interrogation.  For factual support, Daniel cites "1 CT 212-213, 215"—but that is Daniel's motion in limine to exclude "unlawfully obtained statements"—not a transcript of the interrogation itself.  Even if the record contained a transcript of the interrogation, Daniel's argument fails.  Daniel cites no authority for the proposition that by denying having committed murder, he invoked his right to remain silent.

In related *Miranda* arguments, Daniel cites *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148 (*Williams*) and *Reyes v. Lewis* (9th Cir. 2015) 798 F.3d 815, amended on denial of rehearing en banc, 833 F.3d 1001 (*Reyes*). However, neither case is apt.

In *Williams*, police interrogated the defendant until he confessed. Immediately thereafter, police gave *Miranda* warnings and had him write the confession.  (*Williams*, *supra*, 435 F.3d at p. 1150.)  The Ninth Circuit held that "when a law enforcement officer interrogates a suspect but does not give a *Miranda* warning until after obtaining a confession . . . , a court in deciding whether to suppress a subsequent, postwarning confession must determine whether the warning was deliberately withheld." (*Williams*, at p. 1160.)  *Williams* is inapposite because in that case, the interrogation

19

occurred in a coercive police atmosphere.  Here, Daniel confessed to someone he believed to be a cellmate.

*Reyes*, *supra*, 833 F.3d 1001, is also factually off point.  There, without giving *Miranda* advisements, police interrogated a 15-year-old murder suspect for six hours.  The teenager repeatedly indicated that he did not want to answer any more questions.  (*Id*. at pp. 1018-1019.)  After he finally confessed, police *Mirandized* the minor and had him repeat his confession.  (*Id*. at pp. 1021-1022.)  *Reyes* is a nearly textbook case for why *Miranda* exists:  a police-dominated atmosphere with inherently compelling pressures that undermine a person's will to resist.  The setting of Daniel's confession is completely different.  "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."  (*Perkins*, *supra,* 496 U.S. at p. 297.)

        c.      *Constitutionally Improper Police Tactics*

Daniel asserts that before the CI ruse, police placed him in "continuous, stress-inducing custody" for weeks, "waiting to be charged with murder after he had been falsely told he had been identified by witnesses."  Citing Justice Brennan's concurring opinion in *Perkins*, *supra*, 496 U.S. 292, Daniel contends that police subjected him to " 'psychological pressures' " that made him " 'particularly susceptible to the ploys of undercover Government agents.' "  Daniel claims that once he was "forced" to reveal his gang affiliation to the CI, "he was psychologically vulnerable to being pushed to make additional admissions."  This argument is not persuasive.

In *Perkins*, Justice Brennan agreed with the majority's holding that *Miranda* was inapplicable; however, he believed that "the deception and manipulation practiced on [Perkins] raise[d] a substantial claim that the confession was obtained in violation of the Due Process Clause."  (*Perkins*,

20

*supra*, 496 U.S. at p. 301 (conc. opn. of Brennan, J.).) Justice Brennan asserted that "the pressures of custody make a suspect more likely to confide in others and to engage in 'jailhouse bravado' . . . [and that] [t]he State is in a unique position to exploit this vulnerability because it has virtually complete control over the suspect's environment. Thus, the State can ensure that a suspect is barraged with questions from an undercover agent until the suspect confesses." (*Id.* at pp. 302-303.) Justice Brennan also concluded that the undercover police agent had tricked Perkins into confessing. (*Ibid.*)

However, a concurring opinion is not binding precedent. (*Maryland v. Wilson* (1997) 519 U.S. 408, 412-413 [statement in concurrence is not binding precedent].) Moreover, Justice Brennan did not opine that all such undercover operations violated the due process clause. Rather, he suggested that the appropriate approach would be to consider the totality of the circumstances. (*Perkins*, *supra*, 496 U.S. at pp. 302-303 (conc. opn. of Brennan, J.).) The trial court here did so. After listening to the recording, the court found "there was nothing that in any way suggested that Daniel was in some way intimidated into saying what he did to the CI."

Attempting to distinguish the majority holding in *Perkins*, *supra*, 496 U.S. 292, Daniel contends that the "tag team approach" by the CI and Garcia "provided a coercive effect not present in *Perkins*." He also claims that the temporary "rebook/interview cell" compelled him to talk. Further, Daniel argues that the CI was not merely a "passive listener," but instead portrayed himself as an experienced gang member who had committed murder. Daniel concludes, "This was an intricately planned deception."

We agree that police conducted an "intricately planned deception." But that alone does not make the ruse unconstitutional. "Voluntary confessions are not merely 'a proper element in law enforcement,' [citation], they are an

21

'unmitigated good,' [citation], ' "essential to society's compelling interest in finding, convicting, and punishing those who violate the law." ' " (*Maryland v. Shatzer* (2010) 559 U.S. 98, 108.) "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Perkins, supra,* 496 U.S. at p. 297.) What Daniel describes as an "intricately planned deception" is instead good police work—necessitated by the very nature of the crimes. One victim was dead, there was no forensic evidence, and the only other eyewitness, himself a gang member, was unlikely to cooperate with law enforcement. Indeed, that risk materialized when at trial, Julye recanted his identification of Daniel and Elias.

Detective Garcia was in the cell with Daniel and the CI for 41 minutes. However, Garcia never spoke directly to Daniel. Indeed, Daniel said only one thing to Garcia in the entire 41 minutes—he introduced himself as "Kieto from Center Street gang." Accordingly, we reject Daniel's assertion that he was "forced" to reveal his gang affiliation.

After Garcia left the cell, Daniel conversed with the CI, completely unaware that his cellmate was an agent of the police. "*Miranda* forbids coercion," the Supreme Court has said, "not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be" someone he can trust. (*Perkins, supra,* 496 U.S. at p. 297.) There was no police coercion that prompted Daniel to confess.

Further, there is nothing about what the CI said that would have compelled Daniel to believe he must confess to anyone who happened to be present. The CI simply asked an open-ended question, "You got that little feeling that it's something bad?" From that, Daniel quickly proceeded to tell his newfound mentor what happened—ultimately even describing the murder

22

weapon and explaining why they mistook Annebell for a Posole gang member. Daniel's misplaced trust in the CI, and not any coercion, was the catalyst for his confession. (*People v. Tate* (2010) 49 Cal.4th 635, 686 (*Tate*) ["one who voluntarily speaks alone to a friend . . . has no reason to assume, during the private conversation, that he or she is subject to the coercive influences of *police* questioning"].)

Daniel also asserts that the CI "was likely chosen for his aura of intimidation and status" as an older gang member within the hierarchy of criminal street gangs. However, any such status—a gang version of respect for one's elders—would not cause the sort of coercion that concerned the *Miranda* court. "*Miranda* does not protect suspects when they describe criminal activities to people they think are cellmates. [Citation.] Rather, *Miranda* addressed concerns that a 'police-dominated atmosphere' generates 'inherently compelling pressures' that 'undermine the individual's will to resist' questioning. [Citation.] Those concerns evaporate when, as here, an inmate speaks freely to someone he believes is a fellow inmate." (*Rodriguez*, *supra*, 40 Cal.App.5th at p. 198 [rejecting argument that the defendant felt coerced because the informant posed as an older gang member].) Daniel spoke freely and at his own peril. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284 [although defendant "misplaced his trust" in confiding in a fellow inmate who surreptitiously recorded their conversation, "his tape-recorded statements were voluntary and free of compulsion"]; *Tate*, *supra*, 49 Cal.4th at p. 686 ["voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve . . . [the] critical concerns" underlying *Miranda*].)

23

### d. *Involuntary Confession*

Apart from his *Miranda* arguments, Daniel also contends that the "coercive effect" of the police tactics rendered his confession involuntary. Citing primarily *People v. Whitt* (1984) 36 Cal.3d 724 (*Whitt*), *Arizona v. Fulminante* (1991) 499 U.S. 279 (*Fulminante*), *People v. Sims* (1993) 5 Cal.4th 405 (*Sims*), and *Combs v. Wingo* (6th Cir. 1972) 465 F.2d 96 (*Combs*), Daniel contends, "The combined effect of the gang challenge, repeated interrogations without proper *Miranda* advisories, the ruse lineup, the use of a small rebooking cell, . . . the fake grand jury indictment," and his youth (age 20), "overcame Daniel's will to remain silent, even though he plainly was content to keep to himself."

This argument fails because courts have repeatedly found to be proper interrogation tactics that are at least as deceptive as those employed here. These include falsely telling the suspect (1) his fingerprints were found at the scene; (2) he has been identified by a witness; and (3) that a gun residue test was positive. (*Smith*, *supra*, 40 Cal.4th at pp. 505-506 [collecting cases].)

Perhaps one of the most novel deceptions occurred where police told the defendant in *Smith* that a "Neutron Proton Negligence Intelligence Test" showed he had recently fired a gun. (*Smith*, *supra*, 40 Cal.4th at p. 505.) Other cases contain similar holdings. (See, e.g., *People v. Felix* (1977) 72 Cal.App.3d 879, 885 ["it is even permissible to pretend an accomplice has confessed in order to persuade the suspect to confess"]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [officers falsely told suspect that his car was connected with the murder scene by tire tracks and soil samples, that they found physical evidence linked to the victim in suspect's car, and had found incriminating rope fibers in suspect's bedroom]; *In re Walker* (1974) 10 Cal.3d 764, 777 [wounded suspect told he might die before he reached the hospital,

so he should talk while he still had the chance]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124-125 [officer falsely told suspect his fingerprints had been found on the getaway car]; *People v. Farnam* (2002) 28 Cal.4th 107, 182 [police falsely informed the defendant that his fingerprints were on the victim's wallet].)

"A psychological ploy is prohibited only when, in light of all the circumstances, it is so coercive that it tends to result in a statement that is both involuntary and unreliable." (*People v. Mays* (2009) 174 Cal.App.4th 156, 164.) " 'So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence. [Citations.] Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing.' " (*Id.* at p. 165.)

Here, after listening to the recorded conversation between Daniel and the CI, the trial court found that Daniel "may have been influenced by the CI, but nothing the CI did made him talk about this." The court found that the environment itself—a relatively large room with benches to sit on, a toilet, sink, and no ceiling-to-floor bars—was free from coercive influence.

Moreover, although the CI was taller and heavier than Daniel, so too is most of the American adult male population.[11] There is no evidence that the CI was chosen because his physical stature might intimidate, nor is there any evidence that it did intimidate. To the contrary, the court stated, "[I]n

---

[11] Daniel is five feet six inches tall. The average age-adjusted height for American men 20 years old and up is five feet nine inches tall. (Fryar, Kruszon-Moran, Gu, Ogden, *Mean Body Weight, Height, Waist Circumference, and Body Mass Index Among Adults: United States, 1999-2000 Through 2015-2016* (Dec. 20, 2018) National Center for Health Statistics <https://www.cdc.gov/nchs/data/nhsr/nhsr122-508.pdf> [as of April 13, 2023], archived at <https://perma.cc/5WYM-FVWS>.)

listening to [the recording,] there was nothing to suggest in any way [the CI] was in any way intimidating in his actions at all."

The cases Daniel cites do not support a contrary result. Daniel's best argument is based on *Whitt*, *supra*, 36 Cal.3d 724, where in dicta our Supreme Court stated, "[W]hen an accused is in custody and confides in a government agent who is 'ostensibly no more than a fellow inmate' [citation], his statements may be deemed involuntary even though there is no coercion. The accused may well make 'voluntary' statements when he believes he is conversing with an ally. Yet by purposefully creating a false sense of security, the state is in a sense causing or compelling the accused to speak when he would not otherwise do so." (*Id*. at pp. 745-746.) However, reliance on *Whitt* is inappropriate, not only because the key portion is dicta, but more importantly because that case predates *Perkins*, *supra*, 496 U.S. 292, by six years. (See *Alejandre v. Montgomery* (C.D.Cal. Oct. 7, 2019, No. 2:17-cv-07778-JLS-MAA) 2019 WL 7666541, at pp. *11-*12 [declining to follow *Whitt* because "*Perkins*, which controls here . . . is incompatible with such an approach"].)

Daniel's reliance on *Fulminante*, *supra*, 499 U.S. 279 is also unavailing. There, the defendant was charged with murdering a child. A fellow inmate (and police informant) promised to protect him from his fellow inmates, but only if he told him about the murder. The defendant then admitted to sexually assaulting and shooting the victim. (*Id*. at p. 283.) The Supreme Court held the confession was coerced because there was a "credible threat of physical violence" unless the defendant confessed. (*Id*. at p. 287.) There is no evidence of any threat against Daniel.

Daniel's reliance on *Sims*, *supra*, 5 Cal.4th 405 is also misplaced. There, the defendant was in custody in Las Vegas for murders he allegedly

26

committed in California and South Carolina. Police *Mirandized* the defendant and he invoked his right to counsel. As the officers were leaving the interview room, the defendant asked whether he would be extradited. An officer responded by giving a detailed explanation about the defendant's suspected involvement in the California crime—that the police knew the murder victim had delivered a pizza to the defendant's motel room, and the victim's body was found in that room. The defendant interrupted and said, " 'I had to kill that boy.' " Surprised, the officer asked the defendant a question to the effect of, " 'What did you say?' " The defendant repeated, " 'I had to kill that boy.' " (*Id.* at pp. 437-438.)

*Sims* held the defendant's question about extradition did not waive his previously-invoked right to counsel. (*Sims*, *supra*, 5 Cal.4th at p. 441.) Further, according to *Sims*, the officer's nonresponsive answer to the defendant's extradition question violated *Miranda* because the officer "pursued a line of conversation far exceeding the scope of any answer legitimately responsive to a question concerning extradition." (*Id.* at p. 442.) *Sims* is off point because Daniel did not invoke his *Miranda* rights, did not ask to consult with counsel before speaking with the CI, and confessed to someone he believed to be a fellow inmate. (*Perkins*, *supra*, 496 U.S. at p. 300.)

*Combs*, *supra*, 465 F.2d 96 is also distinguishable. There, police elicited a confession after the defendant stated he wanted to talk to an attorney. (*Id.* at pp. 98-99.) In his conversation with the CI, Daniel made no such request.

B.    *The Trial Court Did Not Err in Admitting Daniel's Statements Incriminating Elias and in Denying Defendants' Motions for Separate Trials Because the Evidence Was Cross-Admissible*

1.    *Background*

In speaking to the CI, Daniel identified Elias as "my homie" and by Elias's gang moniker, Blue. Daniel incriminated Elias as an aider and abettor by stating (1) he and Elias drove close to the Park in Elias's car; (2) Elias was "right behind" him during the shooting; and (3) Elias was unarmed and there "to ride" with him. Daniel stated that "everyone knows right there in my hood . . . that it was me with my homie" who shot Annebell. When the CI read the fake indictment containing Elias's name, Daniel said, "That's my . . . homie."

Moving for a separate trial, Elias asserted that because Daniel would not be testifying: (1) admitting this evidence would violate Elias's rights under the confrontation clause of the Sixth Amendment, citing *Aranda*, *supra*, 63 Cal.2d 518, *Bruton*, *supra*, 391 U.S. 123, and *Crawford*, *supra*, 541 U.S. 36; (2) the evidence is inadmissible hearsay; and (3) the hearsay exception for declarations against penal interest is inapplicable because Daniel's statements incriminating Elias are not adverse to Daniel's interest.

Daniel also moved for a separate trial, asserting that severance "was required" to prevent prejudice from the "vast amount of inflammatory evidence that was relevant only to Elias's case." Daniel contends that Elias's rap was "inadmissible against Daniel pursuant to Evidence Code section 352" and evidence obtained from Elias's phone and social media accounts was "highly prejudicial." Daniel also contends that the People's case against Elias included " 'consciousness of guilt' " evidence (including recorded jail phone calls between Elias and his girlfriend) that would not have been admitted in a separate trial against Daniel.

28

The People opposed severance, primarily asserting that each defendant's nontestimonial statements implicating the other are cross-admissible as declarations against interest.

The trial court denied the motions for separate trials on the grounds that Daniel's statements to the CI implicating Elias, and Elias's statements in rap implicating Daniel (1) are not testimonial; and (2) are admissible in a joint trial as declarations against interest. The court added, "Joint trials are favored when both—[the] vast majority of the evidence is against both defendants and would have to be duplicated if we were to sever the case."

2. *General Principles, Separate Trials*

"Section 954 allows for the joint trial of 'two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 275 (*Gomez*).) "Because it generally promotes efficiency, joinder of charges is ' "preferred by the law." ' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 28.) Thus, "[w]here joinder is proper under section 954, '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Gomez*, at p. 275; see *People v. Jackson* (2016) 1 Cal.5th 269, 299 [because of the preference for joinder, " 'a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial' "].)

Where defendants are charged with having committed " 'common crimes involving common events and victims,' . . . the court is presented with a ' "classic case" ' for a joint trial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.)

Nevertheless, " 'the court may, in its discretion, order separate trials "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379.)  Refusal to sever may be an abuse of discretion where:  (1) evidence of the crimes to be jointly tried would not be cross-admissible in separate trials; (2) the charges are unusually likely to inflame the jury against the defendant; (3) a weak case has been joined with a strong case, creating a prejudicial spillover effect.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

We review an order denying a motion to sever for abuse of discretion. (*Gomez*, *supra*, 6 Cal.5th at p. 275.)  In doing so, "we first consider 'the cross-admissibility of the evidence in hypothetical separate trials.' [Citation.]  If the evidence is cross-admissible, then this 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' [Citation.]  If not, then we also consider '(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citation.]  Moreover, '[e]ven if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that "the joint trial resulted in such gross unfairness as to amount to a due process violation." ' " (*Gomez*, at pp. 275-276.)

30

3. *The Trial Court Correctly Denied Elias's Motion for Severance Because There is No Confrontation Clause Violation*

"[T]he Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses." (*People v. Lopez* (2012) 55 Cal.4th 569, 576.)  As Elias notes, a potential issue arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial.  "If the declarant . . . invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine [him] regarding the content of the confession."  (*People v. Burney* (2009) 47 Cal.4th 203, 230, superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App.4th 965, 981.)

To address these concerns, "the *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant."  (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 68 (*Gallardo*).)

However, nearly 40 years after *Aranda* and *Bruton*, the United States Supreme Court clarified the scope of the confrontation clause in *Crawford*, *supra*, 541 U.S. 36.  *Crawford* holds that the confrontation clause prohibits only the admission of *testimonial* statements from an unavailable witness.  (*Id.* at pp. 59, 68-69; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 812 ["Only the admission of testimonial hearsay statements violates the confrontation clause . . . ."].)

*Crawford* did not explicitly define " 'testimonial' statements." (*Crawford*, *supra*, 541 U.S. at p. 51.)  It did, however, describe types of statements that constitute a "core class" of testimonial statements.  (*Ibid.*)

31

These include functional equivalents of in-court testimony, such as affidavits and similar pretrial statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.* at pp. 51-52.) In sum, "the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

Elias's confrontation clause argument fails because Daniel's statements to the CI are nontestimonial. "[S]tatements made unknowingly to an informant or statements between fellow prisoners are 'clearly nontestimonial.' " (*Fayed, supra,* 9 Cal.5th at p. 169.)

*People v. Arauz* (2012) 210 Cal.App.4th 1394 (*Arauz*) is illustrative. There, the defendants were charged with attempted murder in a gang-related shooting. During the investigation, police arrested a suspected accomplice for an unrelated drug offense and placed him in a cell adjoining a paid informant posing as a Mexican Mafia member. (*Id.* at p. 1399.) The accomplice, deceived by this ruse, told the informant he drove the defendants to the scene and defendants shot the victims. (*Ibid.*) Defendants asserted that evidence of the accomplice's incriminating statements violated their confrontation clause rights. (*Id.* at pp. 1401-1402.) Rejecting that argument, the Court of Appeal held the statements were nontestimonial because the accomplice "thought he was answering to the Mexican Mafia. He had no belief that his statements were being monitored and would be used in a subsequent trial." (*Id.* at p. 1402.) "*Arauz* is in accord with numerous federal court decisions that have found statements made to informants under analogous

32

circumstances to be nontestimonial." (*Gallardo*, *supra*, 18 Cal.App.5th at p. 67.)

Like the accomplice in *Arauz*, *supra*, 210 Cal.App.4th 1394, Daniel thought he was conversing with a gang member. The conversations between Daniel and the CI, punctuated with a constant stream of profanity and gang jargon, have none of the formalities associated with sworn testimony. Based on the objective circumstances, no reasonable person in Daniel's position would have believed his statements would be introduced at a later prosecution. (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 67-68 [statements were nontestimonial because, regardless of informant's intent in asking the question, there was no evidence defendant knew or suspected the informant was a government agent or that his comments might be used at trial].)

The *Aranda-Bruton* argument fails for the same reason. Post-*Crawford*, the rule of those cases applies only to *testimonial* statements. (*People v. Cortez* (2016) 63 Cal.4th 101, 129 (*Cortez*) [rejecting *Bruton* argument because, among other things, " 'the confrontation clause applies only to testimonial hearsay statements' "]; see also *People v. Washington* (2017) 15 Cal.App.5th 19, 28.)

Having determined that Daniel's statements to the CI that implicated Elias do not present confrontation clause issues, we turn to whether the trial court properly determined they were admissible against Elias as declarations against Daniel's penal interests.

4. *The Trial Court Correctly Determined That Daniel's Statements to the CI Implicating Elias are Declarations Against Interest*

Hearsay is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).) Evidence Code section 1230 is one such exception for a statement that, "when made, . . . so far subjected [the

declarant] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

The rationale underlying the exception is that " 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) "To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is [1] unavailable, that [2] the declaration was against the declarant's penal interest when made and that [3] the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " (*Ibid.*)

Elias does not challenge the first requirement, that by invoking his Fifth Amendment right against self-incrimination, Daniel was an unavailable witness. (See *People v. Fuentes* (1998) 61 Cal.App.4th 956, 961-962 [declarant asserting the Fifth Amendment privilege is unavailable].) Rather, he contends that *Daniel's* statements implicating Elias are not against Daniel's penal interests.

Two California Supreme Court cases, *Grimes*, *supra*, 1 Cal.5th 698, and *Cortez*, *supra*, 63 Cal.4th 101, guide this analysis. In *Grimes*, the Court clarified the long-standing "*Leach* rule" that Evidence Code section 1230 does not allow the trial court to admit " 'any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' " (*Grimes*, at p. 713, quoting *People v. Leach* (1975) 15 Cal.3d 419, 441.) *Grimes* explained that California cases "have taken a contextual approach to the application of the *Leach* rule. We have applied *Leach* to bar admission of those portions of a third party's confession that are self-serving or otherwise

34

appear to shift responsibility to others. [Citations.] But we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Grimes*, at p. 715.) Noting that "context matters," *Grimes* held that statements tending "to underscore [the declarant's] responsibility for the crime, rather than diminish it," were admissible as declarations against interest. (*Id*. at p. 717.)

In *Cortez*, *supra*, 63 Cal.4th 101, Norma Cortez was jointly tried with a codefendant on charges arising from a drive-by shooting. The trial court admitted a recorded police interview with the codefendant's nephew. The nephew told police that the codefendant said Norma " 'was the one driving' and 'he was the one shooting.' " (*Id*. at pp. 107-108.) The trial court admitted these statements against Norma as declarations against her codefendant's interest. *Cortez* explained, " '[e]ven statements that are on their face neutral may actually be against the declarant's interest.' " (*Id*. at p. 127.) The codefendant's statements were against his penal interest because by identifying his accomplice by name, "he was increasing the likelihood that evidence connecting him to the shooting would be found." (*Ibid*.)

Like the declarant in *Cortez*, here Daniel named and implicated Elias as an aider and abettor. In so doing, Daniel increased the likelihood that evidence connecting him to Annebell's murder would be found. That risk became a reality when the jury heard Elias's rap lyrics incriminating Daniel. Moreover, the challenged statements are also against Daniel's penal interests because they show Daniel committed the crimes with another Center Street gang member for the gang's benefit, supporting a gang enhancement. Significantly, Daniel's statements implicating Elias did not exculpate Daniel.

To the contrary, by telling the CI that Elias was unarmed, Daniel incriminated himself as the shooter. (See *People v. Almeda* (2018) 19 Cal.App.5th 346, 364 [statements implicating a codefendant admissible as declarations against interest where not exculpatory or self-serving].)

Attempting to distinguish *Cortez*, *supra*, 63 Cal.4th 101, Elias asserts that case involved a jointly planned shooting, whereas here, he claims the evidence "did not show the shooting was a joint, planned event." However, even assuming for the sake of argument that this is a relevant distinction, as explained *post* there is substantial evidence of joint planning. In the weeks leading up to the murder, Elias twice had his girlfriend drive him to scout out the Park in rival gang territory where the shooting occurred.

Elias also contends that under *People v. Shipe* (1975) 49 Cal.App.3d 343, the trial court should have excluded Daniel's statements. There, after pleading guilty to a lesser offense, but before sentencing, the declarant confessed and implicated the defendant in a murder. Those statements did not qualify as declarations against interest because the declarant had a strong motive to lie and the statements exculpated himself for the greater offense. (*Id.* at p. 353.) *Shipe* is not helpful because the situation is inapposite. Daniel did not exculpate himself by implicating Elias, and Daniel did not have a strong motive to lie about Elias's involvement.

5. *The Trial Court Correctly Denied Daniel's Motion to Sever*

Daniel contends that the trial court should have ordered separate trials because other "highly prejudicial" evidence was admissible only against Elias. This includes, he asserts, photographs on Elias's phone showing gang affiliation, as well as statements Elias made in recorded conversations with police and his girlfriend.

36

However, this evidence was not "highly prejudicial." It is substantially less inflammatory than admissions Daniel himself made, including that he "mercked a jaina."

Daniel also contends he "would have had a substantially greater likelihood of prevailing on his theory of mistaken identity had he been separately tried" because "[t]he jury was unable to separate out the prejudice of the gang-related evidence for [Elias] . . . ."

This argument is untenable. Daniel told the CI:

- He was involved in a "hot one," i.e., a murder.

- The shooting occurred around 2:00 a.m.

- The shooting occurred in a park.

- He used a .22 revolver.

- Afterwards, he threw away his clothes.

- One of the intended victims escaped.

- He shot Annebell because he mistook her for a male gang member.

- He "got" Posole.

In light of these admissions, it is inconceivable that the jury convicted Daniel because of a carryover effect of gang-related evidence against Elias. For the same reasons, we reject Daniel's claim that he was prejudiced by evidence of Elias's consciousness of guilt (including recorded jail phone calls between Elias and his girlfriend).

Additionally, the trial court instructed with CALCRIM No. 203, telling the jury it "must separately consider the evidence as it applies to each defendant," and it "must decide each charge for each defendant separately." The court also instructed that the jury could consider Elias's statements made in his police interview only against Elias. Although limiting instructions will not necessarily alleviate all prejudice, the instructions here

minimized any prejudice to Daniel from evidence solely admissible against Elias. We presume the jury followed the instructions. (*People v. Potts* (2019) 6 Cal.5th 1012, 1037 (*Potts*).)

Daniel further contends the trial court abused its discretion in denying his motion to sever because in the joint trial, the court allowed Elias's attorney to impeach Daniel's credibility (i.e., regarding what Daniel stated to the CI) with Daniel's prior felony conviction. However, even apart from impeachment, in a hypothetical separate trial a jury would have learned that Daniel had a prior felony conviction. In count 3, the People charged him with being a felon in possession of a firearm. Moreover, the court sanitized this evidence. The parties stipulated that the defendants had previously been convicted of an unspecified felony, and the court instructed the jury to not consider that fact for any other purpose except "in evaluating the credibility of Daniel Ramos's out of court statements. Do not otherwise speculate about or discuss the nature of any other arrests or convictions." Accordingly, there was no prejudice from the jury learning of his prior felony conviction. Nor has Daniel pointed to anything demonstrating that the joint trial " ' "resulted in such gross unfairness as to amount to a due process violation." ' " (*Gomez, supra*, 6 Cal.5th at pp. 275-276.)[12]

C. *The Trial Court Did Not Abuse Its Discretion in Denying the Motion to Disclose the CI's Identity*

1. *Additional Factual Background*

Before trial, defense counsel moved to disclose the CI's identity under section 1054.5, subdivision (b) governing discovery and the due process

---

[12] Daniel's contention that severance was required on the grounds that Elias's rap music was inadmissible against Daniel under Evidence Code section 352 is addressed, and rejected, in section II.D, *post*, dealing with the rap evidence. (See fn. 27, *post*.)

clause. Counsel asserted that the CI's identity was necessary to litigate motions to suppress evidence.

The People opposed the motion, asserting that the CI would not be called as a witness, the recording of the operation "speaks for itself," and the CI was not a percipient witness to the shooting. The People concluded that the CI had no "exculpatory evidence related to the crime beyond what is contained [in] the recorded conversation which has been discovered and transcribed . . . ." The People asserted that "the tone and content of the conversation is readily ascertainable" by listening to the recording and Garcia could testify about what police told the CI relevant to the operation.

Before the jury was impaneled, the court tentatively denied the defense motion on the grounds that, first, "the [CI] has no independent knowledge of the crime, was not a participant or a witness and only knows what Daniel told him *and has no exculpatory information either*. [¶] Secondly, the credibility of the informant is not an issue if the informant isn't going to testify. . . . [¶] And here the full recording has been turned over." (Italics added.)

Having already determined that the recorded conversation did not violate *Miranda* or *Massiah*, and that Daniel's confession was voluntary, the trial court also stated that "information about how the ruse was designed, history of the informant and the effect it would have on the defendant and the information and direction given to the informant for the interview of the defendant isn't relevant, as there's no Fifth or Sixth Amendment violations. . . . [¶] . . . [I]nformation about the body language and nonverbal communication has little relevance as to the statements themselves. Tone and inflection would be clear evidence of the meaning and body language and nonverbal communication; at least in this instance would not be helpful with

39

the interpretation." The court's ruling was "subject to hearing from [Garcia] about the mechanics of the recording."

Later, outside the jury's presence, Garcia testified that the CI could not turn the recorder on or off. The recorder was turned on before the CI entered the cell, and remained so except during a "debrief of the CI on what's occurring in the cell and then turn it back on again." Garcia explained, "One day before the operation, we always have an operational briefing with the requesting Agency, with those people involved, myself, the uniformed people that are involved and the CI. That's both a case briefing and a safety briefing." He further testified that this briefing lasted "at least an hour" and they discussed "the fact pattern of the case, what occurred, who the suspects were in the case, who the victim was, where it occurred." "Then we moved onto a safety brief on how the operation was going to run. We ran down in our mind how we wanted the operation to run on the following day and then concluded with a safety brief." Police informed the CI of "the basic facts of the case: date, time, what occurred." Those briefings are not recorded because confidential matters are discussed.

After Garcia's testimony, the court confirmed its tentative ruling, stating:

> "From the audio itself I could tell, other than the one break we addressed with the Detective, that it was continuous from when turned on throughout. . . . [¶] . . . [¶]

> "Based upon the testimony here, I do find the tape was continuous throughout the time in the cell . . . .

> "I would also note from my own listening to the tape that the tone and inflection of the CI's voice and Daniel's voice that there was nothing that in any way suggested that Daniel was in some way intimidated into saying what he did to the CI.

40

"The CI's voice was calm. Probably chosen for that. There was nothing to indicate that this was in some way coercion to force Daniel to speak. He did so of his own free will."

2.    *Daniel's Contentions*

Daniel contends that the trial court violated his right to present a "complete defense" by denying the motion to disclose the CI's identity. Asserting that the government has a due process obligation to disclose an informant's identity "when it is relevant and helpful to the defense," Daniel contends the CI was a material witness on the following issues:

(1) statements marked "unintelligible" in the transcript and those in which the transcriber provided Spanish to English translation;

(2) the CI's physical attributes and personal demeanor;

(3) Daniel's nonverbal behavior;

(4) gang jargon "that dominated the conversation";

(5) conversations between the CI and Garcia about the gang jargon and strategy to obtain a confession;

(6) the CI's observations of police conduct when "making coercive statements and presenting the fake indictment";

(7) payment to the CI in exchange for extracting Daniel's confession and how that might have affected the operation and his testimony; and

(8) confusion over whether Daniel said that the victim was gay.

3.    *Legal Principles*

Evidence Code section 1041 grants the government a privilege not to disclose the identity of a confidential informant when "the necessity for preserving the confidentiality of [the informer's] identity outweighs the necessity for disclosure in the interest of justice." (Evid. Code, § 1041, subd. (a)(2).) When this privilege is invoked, the state's interest in preserving confidentiality must be balanced against the defendant's right to due process

41

and a fair trial. (*People v. Lee* (1985) 164 Cal.App.3d 830, 835.) That balance hinges on whether the informant has knowledge of facts that would tend to exculpate the defendant. (*People v. Bradley* (2017) 7 Cal.App.5th 607, 621-622 (*Bradley*).)[13] The defendant bears the burden of adducing " 'some' evidence" on this issue. (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1276 (*Davis*).) The defendant's showing "must rise above the level of sheer or unreasonable speculation and reach at least the low plateau of reasonable possibility." (*Ibid*.)[14]

We review the trial court's ruling denying the motion to discover the informant's identity for abuse of discretion. (*Davis*, *supra*, 186 Cal.App.4th at p. 1277.) There is no abuse of discretion in denying the motion where

---

[13] In his reply brief, Daniel contends that analyzing the issue under Evidence Code section 1041 is improper because the trial court did not rely on that statute in denying the motion. However, in the trial court, the People cited Evidence Code section 1041 in opposing Daniel's motion. Although in ruling from the bench the court did not cite that statute, its analysis—and especially the finding that the CI had no exculpatory evidence to offer—tracks the relevant statutory criteria.

[14] In reply, Daniel also asserts that Evidence Code section 1041 only applies where information is furnished in confidence by the informer to law enforcement. He further contends that an informer is someone who " 'confidentially discloses a violation of law.' " Daniel asserts the CI was not an "informer" and the information, because played in court, could not have been " 'furnished in confidence.' "

This argument misunderstands the purpose of Evidence Code section 1041. "The confidentiality of which [Evidence Code] section 1041 speaks is the public interest in the confidentiality of the informant's identity for purposes of effective law enforcement." (*People v. Otte* (1989) 214 Cal.App.3d 1522, 1531.) It "does not refer to the information communicated, unless the contents would disclose or tend to disclose the identity of the informant." (*Ibid*.) In this case, the informant's identity is the confidential information about which the People could assert the privilege.

" 'the record demonstrates, based on a sufficiently searching inquiry, that the informant could not have provided any evidence that, to a reasonable possibility, might have exonerated defendant.' " (*Bradley*, *supra*, 7 Cal.App.5th at p. 620.)

### 4. *No Abuse of Discretion*

The trial court did not abuse its discretion in denying the motion to disclose the CI's identity. There was no evidence that the CI could offer any relevant information not contained in the recording itself. Moreover, evidence supporting the defense theory that the CI intimidated Daniel, if any, could be (and was) elicited from Garcia. He testified that the CI was taller and heavier than Daniel. Defense counsel did not ask any follow-up questions. In denying the motion, the court stated that even without this testimony, the court assumed that the CI was larger than Daniel.

Daniel never demonstrated a reasonable possibility that the CI could provide exculpatory testimony. Even when given the opportunity to cross-examine Garcia about the CI's physical stature and events during the 41 minutes when Garcia was in the cell, Daniel adduced no evidence that his statements were the product of intimidation or somehow taken out of context.

Daniel argues that the CI was a material witness regarding the circumstances of his confession, and that the CI had information no one else could know. However, the fundamental error in Daniel's argument—which defeated his claim in the trial court and defeats it again here—is that he did not make even a low "some evidence" showing that this was the case. There is nothing even suggesting that Daniel was, or even professed to be, intimidated. Our independent listening to the recording shows that the conversation between Daniel and the CI was at all times casual, even friendly—two gang members facing a common adversary and similar charges.

43

There is no evidence that the recording is incomplete or defectively recorded. "The mere assertion that [an] informant is a material witness on [the] issue [of guilt], without any plausible support therefor" is insufficient. (*People v. Fried* (1989) 214 Cal.App.3d 1309, 1315.)

In asserting that the trial court erred in denying his motion to disclose the CI's identity, Daniel primarily relies on *Crane v. Kentucky* (1986) 476 U.S. 683, which held that a defendant was constitutionally entitled to introduce testimony about the physical and psychological environment in which he confessed to show his confession was not credible. However, the facts in *Crane* are substantially different from those here. The confession elicited in that case was not the work of a confidential informant, nor does the opinion indicate that the confession was recorded. Thus, in *Crane* the only source of evidence about the nature and circumstances of the interrogation was from the participants. Moreover, unlike Daniel's case, the defendant in *Crane* made an offer of proof that police officers would testify "about the size and other physical characteristics of the interrogation room, the length of the interview, and various other details about the taking of the confession." (*Id.* at p. 686.) In contrast here, the entire conversation was recorded and Garcia testified about the physical characteristics of the room and other details about the confession. Nothing in the record shows that the CI would have any additional relevant testimony on these issues.

Citing *People v. Lanfrey* (1988) 204 Cal.App.3d 491, Daniel also contends, " 'No one knows what the undisclosed informer, if produced, might testify. He might contradict or persuasively explain away the prosecution's evidence.' " However, *Lanfrey* undercuts Daniel's argument. There, the appellate court affirmed an order denying a motion to disclose a confidential informant's identity because "there was no reasonable possibility that the

44

informer could give evidence on the issue of guilt which might result in [the defendant's] exoneration." (*Id*. at p. 503.) Similarly here, the trial court did not abuse its discretion. The court found "there was nothing to suggest in any way [the CI] was in any way intimidating in his actions at all" and Daniel spoke "of his own free will."

D.    *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Elias's Rap*

1.    *Background*

Police discovered recordings of Elias performing rap on his smartphone and on YouTube. Generally, the rap refers to Center Street gang culture and criminal activity. Before trial, Elias moved to exclude the rap "on hearsay and [Evidence Code section] 352 grounds."[15]

Outside the jury's presence, the court conducted a hearing to address these points. The trial court ruled that the videos were admissible against Elias under the hearsay exception for a party admission and were relevant to show his gang affiliation, premeditation, and intent. The court also noted there was a similarity between events described in one of the songs, "*Blue, Friday Summer Night*," and the charged offenses.

The trial court also ruled the rap was admissible under the hearsay exception for a declaration against interest because (1) the lyrics could subject Elias to criminal liability for participating in a criminal street gang under section 186.22; and (2) Elias was on probation with "gang conditions" and three of the rap videos either occurred or were posted after the court

---

15    Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

45

imposed those terms.  The court found the videos were trustworthy because they were performed with no coercion, published on YouTube, did not shift blame to others, and were made prior to the charged crimes.

Nicholas Olsen, the People's gang expert, testified that rap lyrics identify the monikers of gang members and the individual performing the rap, their association with that gang, and depict the gang's territory.  Only a gang member would make reference to such things in a rap video.  He also testified that the gang rapper uses rap as a diary of gang events.

The rap was played for the jurors, who were also given transcripts of the lyrics.[16]  For example, the jury heard these lyrics in *"Blue, This One's for My Homies"*:

> "This one's for my homies, this one's for my homies. . . .  [¶] New track, new estilo [style], new whip, new bitch, new strap, same hood, same homies, same nut, same rivals getting hit, can't stop 'cause I won't—won't stop 'cause I can't (stop), I am the mother fucken man when it comes to this.  And I am a mother fucker G when it comes to that. . . .  [Y]a know how we rolling, patrollin' . . . .[17] [¶] . . . [¶]
>
> "I'll make your bitch wet every time she hears my voice, it's alright though let it be.  I have her screaming out three letters in my bed, CST. . . .  Kieto's my brother so if you hurt him I hurt you . . . .  I'm a phone call away if it's time to ride.  Let's ride.

---

[16]     The quotes that follow are verbatim from those transcripts, which contain inconsistent and incorrect spellings and punctuation.

[17]     Olsen testified that "whip" is a car, "strap" is a gun, and "same rivals getting hit" means rival gangs getting murdered and assaulted.  When a gang member says "they're a G," that means they are a gangster.  Gang members "rolling and patrolling" means they are in a vehicle trying to find rival gang members to assault.

"... Yeah, in loving memory of Javier Luna, also known as Crooks. Yeah. C's up baby."[18]

In "*Blue, That's How We Do It*," the jury heard Elias sing:

"... I'm strapped now in the neighborhood so you better bow down .... I'm the first one to clack. ... I swear I own my own glock and keep that shit G. I never hesitate when it's time to fuckin' squeeze. ... Oceanside cops (fuck 'em) so you know it don't stop .... Shout out to Kieto, ... really got enemies on the run doin't it for fun caught you on the run doin' it for fun, doin' it for fun, got you on the run just doin' it for fun motherfucker fucker. [¶] ... Let's go to the other side where all the fools they hidin' where the fuck you at?"[19]

In "*Blue, Friday Summer Night*," the jury heard:

"In the land of panocheros so I crack them on [sight]. I gotta let 'em know who the fuck runs the city .... [¶] ... Still in the club holding guns not giving a fuck. In the hood, always trying to function. Give two fucks even though your name was on the gang injunction."[20]

2. *Defendants' Contentions*

Daniel contends the trial court abused its discretion in admitting the rap as declarations against Elias's penal interest. He asserts that the songs could not have subjected Elias to "criminal liability for Annebell's murder

---

[18]  "CST" is Center Street. "To ride" is to find rival gang members and assault them. Javier Luna was stabbed to death by Posole gang members. "C's up" is the gang's sign.

[19]  To "clack" is to shoot. To "squeeze" means to pull the trigger. "Getting enemies on the run" means assaulting rival gang members and causing them to flee. The "other side" refers to Posole territory.

[20]  "Panocheros" is a derogatory term for Posole gang members. To "crack them on sight" means to shoot them on sight.

because they were made several months before the crime occurred." He also contends that two of the five songs were recorded in 2015, and thus could not have subjected Elias to prosecution for violating gang-related probation conditions that were not imposed until 2016. Daniel further asserts there is no evidence showing when the videos were made or lyrics written and, therefore, the songs were inadmissible.

In related arguments directed to lack of trustworthiness, Daniel argues that the trial court "failed to consider Elias's motivation in making the songs, including fame, bragging, and puffery, and that he had reasons to exaggerate." Daniel further contends the rap is simply Elias "exercising his First Amendment right to artistic expression." Echoing that argument, Elias asserts that lyrics do not "always" reflect the author's true state of mind.

Defendants also contend the trial court abused its discretion in determining that the rap was not unduly prejudicial under Evidence Code section 352.

3. *Newly Enacted Evidence Code Section 352.2 Does Not Apply Retroactively*

Before discussing defendants' challenges to the admission of Elias's rap videos, we must address whether newly enacted Evidence Code section 352.2 is retroactively applicable to this case.

Effective January 1, 2023, newly enacted Evidence Code section 352.2 creates specific rules that the trial court must follow in deciding whether to admit evidence of "a form of creative expression" in a criminal trial. Evidence Code section 352.2 states in full:

> "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code] Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal

48

truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings.

"(b) If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party:

"(1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression.

"(2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings.

"(3) Evidence to rebut such research or testimony.

"(c) For purposes of this section, 'creative expression' means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.

"(d) The question of the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to [Evidence Code] Section 402. The court shall state on the record its ruling and its reasons therefor." (Evid. Code, § 352.2.)

In enacting the provision, the Legislature made the following findings and declarations, showing that a particular concern was the possible unfair prejudice stemming from the admission of rap lyrics:

> "(a) Existing precedent allows artists' creative expression to be admitted as evidence in criminal proceedings without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings.  In particular, a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence.  Stuart P. Fischoff, 'Gangsta' Rap and a Murder in Bakersfield,' 29 J. Applied Soc. Psych. 795, 803 (1999); Carrie B. Fried, 'Who's Afraid of Rap? Differential Reactions to Music Lyrics.' J. Applied Soc. Psych. 29:705-721 (1999); Adam Dunbar and Charis E. Kubrin, 'Imagining Violent Criminals:  An Experimental Investigation of Music Stereotypes and Character Judgments,' Journal of Experimental Criminology 14:507-528 (2018).
>
> "(b) It is the intent of this Legislature to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1.)

In its most recent order remanding this matter to us, our Supreme Court directed us to consider the applicability of Evidence Code section 352.2. In their supplemental briefing, defendants contend that Evidence Code section 352.2 applies retroactively to cases, like theirs, that are not yet final. On that basis, they seek reversal of the judgment and a remand so that the trial court may apply Evidence Code section 352.2 in deciding whether to admit Elias's rap videos.  The People contend that Evidence Code section 352.2 is not retroactively applicable.

The general rule is that "when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively." (*In re Estrada* (1965) 63 Cal.2d 740, 746 (*Estrada*).)[21] "Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively." (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).) Here, neither the text of Evidence Code section 352.2 itself, nor the Legislature's findings and declarations, give any express indication that the Legislature intended Evidence Code section 352.2 to apply retroactively to nonfinal cases.

"In *Estrada, supra*, 63 Cal.2d 740, [our Supreme Court] held that amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*Frahs, supra*, 9 Cal.5th at p. 627 [citing *Estrada* at pp. 744-745].) " '*Estrada* stands for the proposition that, "where the amendatory statute mitigates punishment and there is no saving[s] clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." ' " (*Frahs*, at p. 628.) When *Estrada*'s retroactivity principle is applicable, it covers "all cases that are not

---

21    Although some statutory codes contain an express provision setting forth a presumption of prospective application, the Evidence Code does not contain such a provision. (*People v. Hayes* (1989) 49 Cal.3d 1260, 1276 (conc. & dis. opn. of Mosk, J.) ["With the exception of the Evidence Code, the basic California codes contain a provision declaring that 'No part of [this code] is retroactive, unless expressly so declared.' (Civ. Code, § 3; Code Civ. Proc., § 3; Pen. Code, § 3; see also Lab. Code, § 4"]; see also Evid. Code, § 12 [instead of stating that no part of the code is retroactive, providing that, with one exception, a trial commenced before the code's effective date of January 1, 1967, "shall not be governed by this code"].) The absence of an express provision on prospective application in the Evidence Code is not dispositive here, as the common law presumption of prospective application should nevertheless apply. (*Estrada, supra*, 63 Cal.2d at p. 746.)

yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.)

*Frahs* is one of our Supreme Court's most recent opinions concerning the retroactivity of a new ameliorative provision. (*Frahs*, *supra*, 9 Cal.5th at pp. 627-637.) In *Frahs*, our Supreme Court surveyed the situations in which *Estrada*'s retroactivity rule has been applied.

> "We have applied *Estrada*'s inference of retroactivity to statutes governing penalty enhancements, as well as statutes governing substantive offenses. (E.g., *People v. Wright* (2006) 40 Cal.4th 81, 94-95 [newly enacted affirmative defense to transporting marijuana applies retroactively]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 [statute specifying that certain death-penalty qualifying special circumstances must be intentional applies retroactively]; *In re Kirk* (1965) 63 Cal.2d 761, 762-763 [amendment increasing dollar amount concerning insufficient funds checks applies retroactively].)

> "Significantly, we have also applied the *Estrada* rule to statutes that merely made a reduced punishment *possible. . . .* In [*People v. Francis* (1969) 71 Cal.2d 66], we inferred that the Legislature intended retroactive application of an amendment that allowed a trial court to exercise its sentencing discretion more favorably for individual defendants. . . .

> "More recently, in [*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 (*Lara*)], we determined that the *Estrada* rule applied to an amendatory act that 'ameliorated the possible punishment for a *class of persons*.' . . . *Lara* concerned the retroactivity of Proposition 57 (approved by voters, Gen. Elec. (Nov. 8, 2016)) (Proposition 57), the relevant provisions of which prohibit prosecutors from directly filing charges against a minor in 'adult' criminal court and give juvenile courts the sole discretion to determine, after conducting a transfer hearing, whether a minor can be prosecuted and sentenced as an adult. . . . We explained that although Proposition 57 did not mitigate punishment for any particular crime, the *Estrada* inference of retroactivity nevertheless applied because the law 'reduces the possible punishment for a class of persons, namely

juveniles.' . . . We concluded that the potential ameliorating benefit of remaining in the juvenile court system was analogous to the potential reduction in a criminal defendant's sentence in *Estrada* and *Francis*, and therefore the same inference of retroactivity should apply." (*Frahs, supra,* 9 Cal.5th at pp. 628-629.)

After surveying the case law, our Supreme Court in *Frahs* held that, in the absence of a contrary legislative indication, the newly enacted mental health diversion statute, section 1001.36, applies retroactively because it mitigates the possible punishment for a class of persons. (*Frahs, supra,* 9 Cal.5th at pp. 630-637.) *Frahs* explained that "the possibility of being granted mental health diversion rather than being tried and sentenced 'can result in dramatically different and more lenient treatment.' " (*Id.* at p. 631.) Specifically, "[o]n its face, the diversion statute states the legislative purpose 'to promote . . . [¶] [i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety' (§ 1001.35, subd. (a)), and the procedures instituted by the enactment carry the potential of substantial reductions in punishment for the aforementioned parties." (*Frahs*, at p. 631.) Thus, "the ameliorative nature of the diversion program places it squarely within the spirit of the *Estrada* rule." (*Ibid.*; see also *People v. Stamps* (2020) 9 Cal.5th 685, 699 ["Eliminating the prior restriction on the court's ability to strike a serious felony enhancement in furtherance of justice constitutes an ameliorative change within the meaning of *Estrada*."].)[22]

_____

[22] Because the mental health diversion statute at issue in *Frahs*, *supra*, 9 Cal.5th at page 631 could result in the ultimate dismissal of a criminal charge, one court has interpreted *Frahs* as standing for the rule that "[a] possible reduction in the extent of punishment and the possibility of avoiding *any punishment whatsoever* are both 'potentially ameliorative benefit[s].' " (*People v. Montano* (2022) 80 Cal.App.5th 82, 106, italics added (*Montano*).)

As our Supreme Court has recently summarized the applicable rule, "[n]ewly enacted legislation *lessening criminal punishment* or *reducing criminal liability* presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date." (*People v. Gentile* (2020) 10 Cal.5th 830, 852, italics added (*Gentile*); see also *People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*) ["*Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.' "].) Put another way, "In the *Estrada* context, an ameliorative law is one that mitigates the legal effect, or consequences, of criminal conduct." (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 66 (conc. opn. of Bamattre-Manoukian, J.), review granted Aug. 17, 2022, S275341 (*Ramirez*).) No case from our Supreme Court "has ever applied the *Estrada* rule to a statute . . . that does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or a defense." (*People v. Burgos* (2022) 77 Cal.App.5th 550, 572 (dis. opn. of Elia, J.), review granted July 13, 2022, S274743 (*Burgos*); see also *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090 (*Perez*) [newly enacted § 1109 requiring bifurcation of gang enhancements on defendant's request was not retroactive because it "does not reduce the punishment or narrow the scope of the application of the gang statute."].)[23] "The *Estrada* rule applies *only*

---

[23] *Burgos, supra,* 77 Cal.App.5th 550, review granted*, Ramirez, supra,* 79 Cal.App.5th 48, review granted, and *Perez, supra*, 78 Cal.App.5th 192, review granted, discussed the issue of retroactivity in the context of a different newly-enacted statutory provision, section 1109, which provides that, upon a defendant's request, the trial of gang enhancements must be bifurcated from the trial of substantive offenses. (§ 1109, subds. (a) & (b).) As we will discuss in section II.P, *post*, appellate opinions are divided on whether section 1109 retroactively applies to nonfinal cases, and that issue is currently pending before our Supreme Court.

where the new law is 'ameliorative' of criminal liability or punishment." (*Burgos*, at p. 573 (dis. opn. of Elia, J.).) As one court has concluded, "our high court has declined to extend the reach of *Estrada* to legislative action that does not alter or reduce criminal punishment or treatment for past criminal conduct." (*People v. Cervantes* (2020) 55 Cal.App.5th 927, 939 [citing *People v. Brown* (2012) 54 Cal.4th 314, 317-318].)

Thus, in the absence of any legislative indication to the contrary, to decide whether Evidence Code section 352.2 is retroactively applicable to nonfinal cases, we must determine whether it is either legislation "lessening criminal punishment" or legislation "reducing criminal liability." (*Gentile*, *supra*, 10 Cal. 5th at p. 852.) The answer to both questions is clearly no. Even though Evidence Code section 352.2 may, in many instances, end up being beneficial to a criminal defendant in that it may result in the exclusion of evidence favorable to the People, it is not a statute that creates the possibility of *lesser punishment* or any other type of more lenient treatment. It is also not a statute that *reduces criminal liability*, such as by altering the substantive requirements for a conviction or expanding a defense.[24] Instead, the Legislature's findings and declarations show that Evidence Code section 352.2 was enacted to prevent the admission of unfairly prejudicial evidence when not warranted in the circumstances of a particular case. (Stats. 2022, ch. 973, § 1.)

---

[24] Moreover, as the People point out in supplemental briefing, Evidence Code section 352.2 may also, in certain instances, work against the interests of a criminal defendant. As the People explain, "prosecutors are a party to criminal actions and may oppose under Evidence Code section 352.2 a defendant's proffer of rap-lyric evidence as, for example, third-party culpability evidence. If a prosecution-requested exclusion occurs, the new rule will harm some criminal defendants just as much as it helps many others."

Citing *Lara*, *supra*, 4 Cal.5th at pages 307-311, and *Frahs*, *supra*, 9 Cal.5th at page 624, Daniel argues, "Retroactivity is not limited to laws that decrease punishment or give courts discretion to consider different sentencing outcomes. The *Estrada* presumption also applies where a new law creates a *potential* ameliorative benefit to defendants."[25] However, in *Lara* the potential ameliorative benefit to the defendant concerned "the possible *punishment* for a class of persons, namely juveniles" (*Lara*, at p. 308, italics added), and in *Frahs* the potential ameliorative benefit was the "potential of substantial reductions i*n punishment*" due to mental health diversion, including the possible ultimate dismissal of criminal charges (*Frahs*, at p. 631, italics added). Here, as we have explained, Evidence Code section 352.2 does not enact a lesser punishment, potential or otherwise, and does not give rise to more lenient treatment of a defendant. It also does not alter criminal liability. It is therefore not an ameliorative enactment within the meaning of *Estrada*.

We are aware that *People v. Venable* (2023) 88 Cal.App.5th 445 recently came to a different conclusion about the retroactivity of Evidence Code section 352.2. We respectfully disagree with our colleagues in Division Two. *Venable* concludes that our Supreme Court's opinions in *Lara*, *supra*, 4 Cal.5th 299 and *Frahs*, *supra*, 9 Cal. 5th 618 support the retroactive application of Evidence Code section 352.2. (*Venable*, at pp. 456-457.) But as

---

25      Elias makes a similar argument, focusing on what he identifies as the ameliorative effect of Evidence Code section 352.2. "The logic in *In re Estrada*, *supra*, applies here. The changes set forth in the new statute, although not directly reducing punishment, are ameliorative to criminal defendants in the sense that they are intended to benefit criminal defendants by the exclusion of harmful and prejudicial evidence in the form of creative expressions. This potentially results in the defendant not being convicted, or convicted of a lesser crime."

we have explained, we do not believe those authorities control because those two cases concern statutory enactments resulting in potentially more lenient *punishment* for defendants, which is not the effect of Evidence Code section 352.2.

Current precedent from our Supreme Court does not support an extension of the *Estrada* rule to a statutory change that may possibly benefit a criminal defendant but that does not redefine the conduct subject to criminal sanctions or, at least potentially, reduce or eliminate the applicable punishment. Therefore we conclude Evidence Code section 352.2 does not apply retroactively.

4. *No Abuse of Discretion in Determining Elias's Rap Videos Are Declarations Against Elias's Penal Interest*

Having concluded that Evidence Code section 352.2 is not retroactively applicable, we turn to defendants' arguments challenging the admission of Elias's rap videos. We review the trial court's decision to admit evidence under Evidence Code section 1230 for abuse of discretion. (*Grimes*, *supra*, 1 Cal.5th at p. 711.) The decision " ' " 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.)

As a threshold issue, we reject Elias's contention that it is "not even certain" that he wrote the lyrics. The applicable standard does not require authentication to a certainty. Moreover, outside the jury's presence the court conducted a hearing where the People authenticated the rap as Elias's. In allowing the evidence, the court stated that the jury would make the ultimate determination. Defendants were free to argue that Elias did not write and did not perform the rap. In closing arguments, neither defense counsel did so.

57

To the contrary, Elias's lawyer effectively conceded Elias's authorship, arguing, "They didn't find the firearm that [Elias] raps about in *his* tracks when he says:  I own my own Glock."  Later, counsel similarly stated, "I'd submit to you that what we're essentially listening to *in Mr. Elias Ramos' music*, whether you like it or not or you find the lyrics distasteful or not, is essentially kind of a representation of the things in his world . . . ."  (Italics added.)

Turning to the hearsay exception, Daniel contends the songs were not against Elias's penal interest because they only show that Elias was in a gang, and " '[m]ere active and knowing participation in a criminal street gang is not a crime.' "  Daniel asserts there was "no evidence" that the rap referred to actual crimes and "merely rapping about Center Street and its members did not subject [Elias] to criminal liability under section 186.22."

Section 186.22, subdivision (a) creates a substantive offense for " '[1] [a]ny person who actively participates in any criminal street gang [2] with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and [3] who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . .' "[26] (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.)  Elias's rap is against Elias's penal interest because in those songs Elias admits each of these elements:

---

[26]    Section 186.22, subdivision (a) currently provides:  "A person who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."  Daniel and Elias were not charged with a violation of section 186.22, subdivision (a).

(1) *Active participation*:  Elias raps that he is "[r]ollin' with the older homies . . . Kieto's my brother so if you hurt him I hurt you . . . I'm a phone call away if it's time to ride.  Let's ride."  He also sings that he doesn't "hesitate to squeeze [i.e., shoot]."  He then sings, "Center Street on my neck so you know I did it"—Elias actually has "Center Street" tattooed on his neck;

(2) *Knowledge that its members engage in a pattern of criminal activity*:  Elias raps, "It's Center Street gang comin' at you with the sickest, the realest about to kill it . . . that's how we do it motherfuckers . . . aiming for the dome so you can fuckin' die slow and you know how we do it up in Center Street fool"; and

(3) *Willfully promotes, furthers, or assists in the gang's felonious conduct*:  Elias sings, "And when you hit my mother fucken bridge be strapped 'cause my homies will aim right at you, fuck around and they might just snatch you."  "He asked me 'if my pistol packin' I told him 'hell yeah dawg' and he just started laughing (ha).  Just in case a motherfucker wanna act up we do 'em up real quick thought you knew what's up."

The trial court correctly ruled that these statements "could subject Elias to criminal liability for participation in a criminal street gang under [section] 186.22 [subdivision] (a)."  " ' "To be against penal interest . . . the statement need not be made to persons who are likely to use it against the declarant in court proceedings.  Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities.  [Citations.] Indeed, that makes such declarations more trustworthy." ' "  (*People v. Masters* (2016) 62 Cal.4th 1019, 1056.)  Moreover, the songs not only helped establish that Elias was Blue of the Center Street gang, but also that with Daniel (Kieto), he went looking to assault Posole gang members.

Additionally, even assuming that Elias wrote these lyrics before the charged offenses, lines such as: (1) "I'm the first one to clack. . . . I swear I own my own glock and keep that shit G. I never hesitate when it's time to fuckin' squeeze"; and (2) "In the land of panocheros so I crack them on sight. I gotta let 'em know who the fuck runs the city . . . ." show intent and motive to find and shoot Posole gang members in Posole territory.

Moreover, there are similarities between the instant crimes and events described in the rap. In "*Blue, Now You Know*," Elias raps that he makes rivals "run and hide[,] do or die." Annebell hid; Julye ran for his life. In "*Blue, That's How We Do It*," Elias raps that Center Street is "aiming for the dome [head] so you can fuckin' die slow." Annebell died when the bullet severed her spinal cord and blood accumulated at the base of her skull.

*People v. Zepeda* (2008) 167 Cal.App.4th 25 (*Zepeda*) further supports the trial court's ruling. In *Zepeda*, the defendant shot a rival gang member and killed the rival's son. (*Id.* at p. 28.) The trial court allowed into evidence this rap written by the defendant: "[G]uard your house and load the gate mother fucker I'm about to retaliate, creepin' up in your window, puttin' a slug into your face, slippin' and sliding outta the scene so bad I don't catch a case . . . ." (*Id.* at p. 33.) On appeal, the defendant argued the evidence was inadmissible because the lyrics were "works of fiction presuming to be art." (*Id.* at p. 34.) Rejecting that argument, the court held the lyrics showed motive and intent to kill rivals, even if the lyrics predated the charged offenses. (*Id.* at p. 35.)

Of course, in many other contexts, song lyrics do not reflect their author's true state of mind. Neil Young did not shoot his girlfriend, although he sang that he did in "*Down by the River*." And Johnny Cash did not kill a man in Reno just to watch him die, even though he sang that he did in

60

"*Folsom Prison Blues.*" However, the significant distinction between lyrics such as these and Elias's rap is that the "street gang rap artist" creates rap as a "diary of themselves." Accordingly, Elias's rap may reasonably be understood as evidence of his state of mind, his motives and intentions, and his loyalty to Center Street in furthering its criminal gang activities. (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35 [expert testified that gangs communicate through music; held: rap lyrics admissible].) "If Johnny Cash had ever been charged with murdering a man in Reno, the prosecution would have likely been able to introduce Cash's lyrics as evidence that the murder was premeditated." (*United States v. Carpenter* (E.D.N.Y. 2019) 372 F.Supp.3d 74, 78-79.) Similarly here, charged with hunting Posole gang members to kill in Posole territory, Elias's lyrics, (1) "Let's go to the other side where all the fools they hidin' where the fuck you at?", (2) "In the land of panocheros so I crack them on sight," and similar statements are admissible declarations against his penal interest. "Artistic work that refers to a specific act or motive that can be tied back to the alleged crime can be highly probative evidence." (*Id.* at p. 79.)

Nevertheless, Daniel asserts that even if admissible against Elias, the rap was inadmissible against Daniel because "Daniel did not write the lyrics, perform in the videos, or post the videos to YouTube." However, Elias's raps refer to Daniel (Kieto) as his "brother" who, in committing gang crime, is "*right beside me.*" (Italics added.) In a recorded jail conversation, Julye told JoJo that Daniel and Elias were "side by side" when the shooting started. The trial court did not abuse its discretion in ruling that the evidence was

61

admissible against Daniel to show identity stemming from his association with Elias as depicted in the rap.[27]

5. *The Trial Court Did Not Abuse Its Discretion in Determining the Rap Lyrics Were Trustworthy*

" 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Grimes, supra*, 1 Cal.5th at p. 711.) " 'There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry.' " (*Arauz, supra*, 210 Cal.App.4th at p. 1400.)

Contrary to Daniel's contention, the trial court did not abuse its discretion in determining the rap evidence was trustworthy. The " 'most reliable circumstance is one in which the [statements] occur[ ] between friends in a noncoercive setting that fosters uninhibited disclosures.' "

---

27    Daniel makes these same arguments in also asserting that the court erred in denying his motion to sever. Moreover, as explained *post*, we reject the argument that the rap was inadmissible under Evidence Code section 352. Accordingly, Daniel's arguments for severance on that ground fail. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 ["a declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness"]; see also *People v. O'Malley* (2016) 62 Cal.4th 944, 968 ["significant cross-admissible evidence" justified the trial court's refusal to sever].)

(*People v. Tran* (2013) 215 Cal.App.4th 1207, 1217.) Elias's rap was performed "in an informal setting with no coercion of any type."

Daniel also contends the rap is not trustworthy because it is mostly bragging and exaggeration. However, the trial court could reasonably conclude otherwise. Olsen testified that unlike commercial rap music, gang rap is not fictional storytelling. Moreover, it is unlikely that Elias was merely boasting because gangs will discipline a member claiming credit for gang crime committed by another.

Daniel's argument that the rap is an exercise in "First Amendment right to artistic expression" also fails. Although the First Amendment limits the government's ability to regulate the content of speech, it "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 489.)

6. *The Trial Court Did Not Abuse Its Discretion in Applying Evidence Code Section 352 and in Determining the Rap Was Not Improper Character Evidence*

Before trial, the defense offered to stipulate that Center Street is a criminal street gang that engages in criminal activity, including predicate offenses required for the allegations under section 186.22, subdivisions (b)(1) and (b)(5). In light of this proposed stipulation, the defense asked the court to exclude testimony from the People's gang expert as involving "an undue consumption of time." Counsel also sought to limit the gang expert's testimony on "ultimate opinion[s]" and to exclude "evidence that the shooting constituted gang-related conduct" on the grounds it was "far too insubstantial . . . to be presented to a jury" and was "extremely prejudicial."

Additionally, invoking Evidence Code section 352, Daniel's attorney moved to exclude "gang predicates, evidence of field interviews, and other extraneous gang evidence." At a pretrial hearing, Daniel's attorney stated,

63

"There's really not going to be any dispute that Center Street is a criminal street gang . . . . [¶] And at least from Daniel's perspective at this point, it's not going to be in dispute that Daniel was a member of this gang. . . . [¶] . . . [¶] We need to do a full [Evidence Code section] 352 analysis even if the District Attorney is not willing to stipulate on a piece of paper."

The trial court denied the motion to exclude the gang expert's testimony, noting that the People agreed that the expert would not opine regarding Daniel's and Elias's "subjective specific intent or knowledge" nor "relate case specific hearsay." The court ruled that the gang expert could testify about gang signs, symbols, territory, operations, primary activities, and pattern of criminal conduct—plus opinions "based upon case specific facts that have been independently established by competent evidence." The court noted that the rap was prejudicial only because it was so probative on motive, intent, and identity, and "not because of some . . . extraneous factors one would look at when they're doing a[n Evidence Code section] 352 analysis, which the Court has looked at."

Daniel contends the trial court abused its discretion in making these rulings because, "There is no evidence Daniel wrote the lyrics, performed in the videos, downloaded [*sic*] them onto YouTube, or provided the background music." He argues that the evidence would evoke an "emotional bias" while having "no relevance to whether he was the shooter." He further contends that he is "not responsible for what Elias had on his cellphone and social media accounts" and "[t]he jury should have been instructed they could not use this inflammatory evidence" against him. Elias argues that the rap evidence was inadmissible character evidence because "[i]ts only relevance was to show he was the type of person likely to have been the second suspect."

64

"Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, 'trial courts should carefully scrutinize such evidence before admitting it.' " (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

Under Evidence Code section 352, a court may exclude evidence where its probative value is substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) " ' "Prejudice," as used in Evidence Code section 352, is not synonymous with "damaging." [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587.) " ' "We will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Miles*, at pp. 587-588, italics omitted.)

The trial court did not abuse its discretion in allowing the rap evidence. Intent and identity were at issue, and the rap evidences that Daniel and Elias were active Center Street gang members, that each had a motive and intent to kill Posole gang members (or Annebell, who appeared to be one), and that each defendant committed the crimes for the gang's benefit.

65

We agree with Daniel that jurors would find the gang culture and conduct described in the rap to be reprehensible and depraved. But that lifestyle was a central issue in this case because the offenses were alleged to be gang related. That probative evidence reflects negatively on a defendant is not grounds for its exclusion under Evidence Code section 352. The prejudice with which that statute is concerned is that which causes a jury to prejudge a party based on extraneous factors rather than relevant and probative evidence. (*People v. Tran* (2011) 51 Cal.4th 1040, 1048.) The songs challenged here were much less inflammatory than the murder itself—shooting an unarmed teen hiding in a jungle gym at a public park. The trial court could reasonably conclude that the rap "did not rise to the level of evoking an emotional bias against [either] defendant as an individual apart from what the facts proved." (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35 [rejecting a claim of Evidence Code section 352 error in the introduction of rap lyrics in a gang murder case].)

*People v. Coneal* (2019) 41 Cal.App.5th 951, cited by defendants, is materially distinguishable. There, the trial court erred by admitting rap videos because the evidence was cumulative and offered to show criminal disposition. (*Id*. at pp. 965-970.) Moreover, there was no evidence that the lyrics depicted actual events the defendant or his gang "committed or intended to commit." (*Id*. at pp. 969-970.) Because the rap evidence had little probative value, the prosecution in *Coneal* proffered the evidence to prove that defendant " 'embraced the gang lifestyle' " and was a violent gang member. As such, the People "skirt[ed] dangerously close to advocating the use of the videos as evidence of [the defendant's] violent character." (*Id*. at p. 971.)

66

Unlike *Coneal*, here the rap was not cumulative and as explained *ante*, the lyrics are probative of Daniel's and Elias's motive and intent to kill Posole gang members at the Park. Moreover, unlike *Coneal*, here the prosecutor did not impermissibly offer the evidence to show the defendants had violent dispositions—rather, the prosecutor (and the court) explicitly stated the evidence was being admitted to show "motive, intent and premeditation."

7.    *The Trial Court Did Not Abuse Its Discretion in Allowing Expert Testimony on the Meaning of Gang Jargon in Rap Lyrics*

Olsen translated the rap's gang jargon into everyday English. (See fns. 17-20, *ante*.) He also testified that when a Center Street member speaks of going "to the other side where all the fools, they hiding," it means going to Posole territory.

Citing Evidence Code section 801, subdivision (a), Daniel contends Olsen's testimony was improper because the lyrics were "not 'sufficiently beyond common experience' to require [the expert's] interpretation." In related arguments, Daniel also contends that Olsen's testimony about the rap "was prejudicial and cumulative to the other detectives' testimony."

" 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' [Citations.] 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 425-426.)

Daniel's arguments are untenable for at least two reasons. First, the trial court did not abuse its discretion in determining that Olsen was qualified to opine on the meaning of gang jargon. Olsen had four years'

67

experience investigating gang crimes. He had particular expertise with the Center Street gang, having contacted its members for the past 11 years.

Second, the trial court did not abuse its discretion in concluding that expert testimony on these matters was appropriate. "In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.) Courts have repeatedly held that the elements of gang culture, including the slang they use, are beyond the ken of most jurors and thus an appropriate topic for expert testimony. (*Id.* at pp. 46-47 [white supremacist terminology]; *People v. Champion* (1995) 9 Cal.4th 879, 924 & fn. 15 [expert translated gang terms], overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.)

E.    *The Trial Court Did Not Abuse Its Discretion in Admitting Gang Evidence Apart from Rap*

Citing *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), Daniel contends the trial court should have "limited the gang testimony" and precluded police detectives from testifying about "the Mexican Mafia," Elias's Center Street tattoo, photographs of Elias with fellow gang members, a photograph of a person alleged to be Elias with a revolver in his waistband, and a trial exhibit (exhibit 30), which Daniel's brief describes as "a photograph of an insect on top of a nude female with a caption stating, 'How girls feel when they fuck a nigga from the Eastside.' " Daniel contends this "unduly prejudicial" evidence "had no relevance."

However, references to the Mexican Mafia were not inflammatory. The gang expert testified that there are severe repercussions for "street-level Hispanic gang members" if they disobey "rules outlined by Mexican Mafia." There was no evidence or suggestion that defendants were members of the Mexican Mafia. Elias's gang tattoo, photographs with other gang members,

68

and photograph with a revolver are relevant to motive and intent. Although we are troubled by Daniel's characterization of exhibit 30, he does not cite to any portion of the reporter's transcript where that exhibit was discussed by a witness or published to the jury. Our independent review of the record shows that references to exhibit 30 were sanitized to avoid any undue prejudice. Olsen testified that the reference to "Eastside" was another way of referring to Posole. The derogatory photograph was relevant to show the extent of the gang rivalry. On cross-examination, Olsen testified that this type of "slander or propaganda" is common in gang subculture—thus further ameliorating any undue prejudice.

Moreover, Daniel's reliance on *Albarran* is misplaced. In *Albarran, supra*, 149 Cal.App.4th 214, two men shot at a house during a party. A witness who had been within 10 feet of both gunmen did not identify Albarran. He testified he knew Albarran from school and would have recognized him if he had been one of the shooters. (*Id.* at pp. 217-219 & fn. 1.) Nevertheless, the trial court permitted the prosecutor to introduce "a panoply of incriminating gang evidence" against Albarran. One deputy testified to Albarran's gang membership, his gang tattoos (including a Mexican Mafia tattoo), the prevalence of graffiti for Albarran's gang around his home, the identities and arrests of other members of Albarran's gang, and the crimes that the gang committed. The deputy also testified that the resident of the house belonged to a different gang. The deputy opined that the shooting was gang related and intended to benefit Albarran's gang, which was engaged in an active gang war. (*Id.* at pp. 220-221, 227.)

The Court of Appeal concluded that it was error to admit the gang evidence because it was irrelevant, cumulative, and presented a substantial risk of undue prejudice, noting further that the "paramount function of this

69

evidence was to show [the defendant's] criminal disposition." (*Albarran, supra,* 149 Cal.App.4th at p. 228.) The outcome in *Albarran* was compelled by the complete absence of evidence that the crimes were gang related or that the defendant had a gang motive. (*Id.* at pp. 217, 222, 227.) Daniel and Elias's case is very different. The gang motive is plain. Moreover, in *Albarran* other people essentially portrayed the defendant as a bad and dangerous person, based in part on the behavior of those with whom he associated. In contrast here, Elias freely rapped about his gang affiliation and crimes, Daniel confessed to killing Annebell with a .22-caliber revolver, and there was expert testimony of gang affiliation.

F. *The Trial Court Did Not Err in Allowing Evidence Of Six Predicate Offenses*

1. *Background*

The jury found that Daniel and Elias committed murder and attempted murder for the benefit of or in association with a criminal street gang within the meaning of section 186.22, subdivision (b). At the time of trial, the statute stated, "A criminal street gang is any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.' [Citations.] A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of *two or more*' specified criminal offenses within a certain time frame, 'on separate occasions, or by two or more persons' . . . ." (*People v. Tran, supra,* 51 Cal.4th at p. 1044, italics added.) The "two or more" specified criminal offenses are commonly referred to as "predicate offenses." (*People v. Gardeley* (1996) 14 Cal.4th 605, 610, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13 (*Sanchez*).)

70

Before trial, the defense moved to exclude evidence of predicate offenses under Evidence Code section 352. Daniel's attorney offered to stipulate that Daniel is a Center Street gang member "and the predicates for that." Elias's attorney also expressed a willingness to stipulate "to some of the facts and predicates."

However, the People declined the offer and instead moved to admit six predicates, one of which was Elias's prior conviction for unlawfully possessing a firearm. Citing *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*) and *People v. Hill* (2011) 191 Cal.App.4th 1104 (*Hill*), the prosecutor stated, "Case law favors the admission of multiple predicates in gang cases where [section] 186.22 is alleged."

To "minimize" undue prejudice, the prosecutor told the court that his witness would not recite the underlying facts of the predicates "in gross detail other than what is reflected in the certified record of conviction." The prosecutor stated that he would only ask, "[O]n this date and time, was this individual convicted of this offense? Yes. That person a gang member based on your training and experience? Yes. Number one is done. Then the same thing with number two, three, four through six and—and that's it."

Objecting, Elias's attorney argued, "[T]here's several predicate offenses that can be chosen from," making it unnecessarily prejudicial to include Elias's conviction for unlawfully possessing a firearm. Elias's attorney further argued, "I think [six] exceeds what's required by the statute. It continues the prejudicial effect and certainly would not be necessary." Elaborating on the argument, Daniel's attorney argued:

> "[W]hen we have a gang case, not only a gang case but a gang murder case with the kinds of content that the District Attorney wishes to put forth, then . . . the prejudicial effect of all of these things coming in, when it is not a fact that is going to be in dispute. [¶] . . . [¶]

71

"There's really not going to be any dispute that Center Street is a criminal street gang or that Varrios Posole Locos is a criminal street gang.

"And at least from Daniel's perspective at this point, it's not going to be in dispute that Daniel was a member of this gang.

"So to continue to allow the District Attorney to put, as he said, the full strength of their case, it's obvious from the prosecution perspective why he wants to bring all this in, because the more a jury . . . hear[s] the bad things that these gangs do, having nothing to do with the individual facts of this case, is going to inexorably prejudice them against whoever is sitting here on a case that really comes down to ID, not whether it was for the benefit of the gang, not whether the gang is an actual gang."

After requesting and reviewing supplemental briefs, the trial court noted that the defense stipulation being offered "is only to certain elements of the [section] 186.22 charge" and "not the entire allegation." For example, the defense had not offered to stipulate that each defendant "intended to assist, further or promote criminal conduct by gang members; nor the nature of a gang's primary crimes and the pattern and activity." Accordingly, the court ruled, the "predicate offenses" remained "highly relevant." Additionally, the court ruled that the People could not be compelled to accept a stipulation if the effect would be to deprive the State's case of its forcefulness, and "that's what would occur here."[28]

---

[28] "A trial court cannot compel a prosecutor to accept a stipulation that would deprive the state's case of its evidentiary persuasiveness or forcefulness. [Citations.] '[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.' " (*People v. Rogers* (2013) 57 Cal.4th 296, 329-330.)

72

Further, "even apart from the gang allegations" relating to the enhancement, the court noted that the alleged "motive for the murder and attempted murder is that they were gang motivated, and so the actual evidence concerning the Center Street gang is very probative of the motive," which in turn is relevant in establishing intent.

Rejecting defense objections under Evidence Code section 352, the trial court stated: "And so even considering 352 and understanding the effect of gang evidence, the evidence here is so probative on important factors for the People's case that the probative value outweighs any prejudicial effect."

At trial, the prosecutor elicited testimony of the following predicate offenses committed by Center Street gang members:

(1) Elias, convicted in December 2015 for unlawfully possessing a firearm;

(2) Luis Mejia Rivera, convicted by guilty plea in November 2015 for assault with a deadly weapon (ADW) with an enhancement for causing great bodily injury, and another count of assault by means likely to produce great bodily injury;

(3) Vincente Huerta, convicted in June 2015 for ADW;

(4) Fermin Barrera, convicted by guilty plea for ADW;

(5) Jesus Castro Palacioa, convicted in June 2011 for ADW with great bodily injury; and

(6) Jesus Perez, convicted in November 2009 for ADW.

2.     *The Trial Court Did Not Abuse Its Discretion*

Daniel contends it was undisputed that Center Street is a criminal street gang, and section 186.22 only requires two predicate offenses. He asserts, therefore, the trial court abused its discretion under Evidence Code section 352 by allowing six predicates into evidence. We disagree.

73

We first consider evidence of Elias's own predicate offense, since that carries the highest potential for undue prejudice. In *People v. Tran*, *supra*, 51 Cal.4th 1040, our Supreme Court held that evidence of a prior offense committed by the defendant on a separate occasion can be used to prove gang allegations under section 186.22. (*Id*. at p. 1044.) In that case, Tran, a prominent gang member, shot an innocent bystander during a gang altercation, believing the victim to be a member of a rival gang. (*Id*. at pp. 1044-1045.) Among other charges, the prosecution alleged a gang enhancement under section 186.22. (*Id*. at p. 1046.) To establish a pattern of criminal gang activity as required to prove those charges, the prosecution presented evidence of prior criminal activity undertaken by Tran and other gang associates, including evidence that Tran had pled guilty to a charge of extortion three years earlier. (*Id*. at pp. 1045-1046.)

On appeal, Tran argued the trial court abused its discretion by admitting evidence of his prior offense because its prejudicial effect substantially outweighed its probative value. (*People v. Tran*, *supra*, 51 Cal.4th at p. 1047.) Rejecting that argument, our Supreme Court stated, "In prosecutions for active participation in a criminal street gang, the probative value of evidence of a defendant's gang-related separate offense generally is greater [than in other cases] because it provides direct proof of several *ultimate facts* necessary to a conviction. Thus, that the defendant committed a gang-related offense on a separate occasion provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity." (*Id*. at p. 1048.) The Court therefore held the evidence was admissible.

74

Here, the trial court conscientiously grappled with these issues, heard extensive argument by counsel, and even requested and reviewed supplemental briefs. Even if evidence of other predicate offenses made it unnecessary to use Elias's prior conviction, "[t]hat the prosecution might be able to develop evidence of predicate offenses committed by other gang members . . . does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal gang activity." (*People v. Tran, supra*, 51 Cal.4th at p. 1049.)[29]

Section 186.22 "speaks of a 'pattern' and permits the prosecution to introduce evidence of 'two or more' offenses." (*Rivas, supra*, 214 Cal.App.4th at p. 1436.) Courts have found no abuse of discretion where a trial court has allowed evidence of six predicate offenses. (*Ibid*.) And in *Hill, supra*, 191 Cal.App.4th 1104, the appellate court upheld the admission of eight predicate offenses over the defendant's Evidence Code section 352 objections. (*Hill*, at pp. 1138-1139.) The court concluded that the admission of the eight predicate offenses did not create a " 'street brawl' " or " 'endless discussions' " on the subject of gangs. (*Id*. at p. 1139.)

As courts have recognized, a prosecutor reasonably may be "leery of introducing too little evidence about predicate crimes" lest their convictions be overturned on appeal based on insufficient evidence. (*Rivas, supra*, 214 Cal.App.4th at p. 1436.) Indeed, in this case, Elias asserts "the predicates were insufficient to establish that any of the crimes were the gang's primary activity." Given the necessity of proving the elements of the

---

[29] Daniel's trial lawyer conceded this point, stating outside the jury's presence, "To be completely honest and being frank with the court, the court doesn't have to agree with my [Evidence Code section] 352 analysis, of course, and looking at the case law, because the way gang cases go, this court probably wouldn't be reversed on it. And I'm not trying to say that it would."

gang enhancement (and to guard against insufficiency of evidence claims), allowing evidence of six predicate offenses was not an abuse of discretion.

Moreover, the evidence was not unduly prejudicial. An important factor in determining whether evidence of a defendant's other offenses is unduly prejudicial is whether it is more inflammatory than the charged crimes. (*People v. Tran*, *supra*, 51 Cal.4th at p. 1047.) As the trial court correctly recognized, although the predicates in this case included ADW, they did not include homicide and thus were less inflammatory than the charged crimes. Additionally, evidence establishing the predicate offenses was introduced with a single witness, and his testimony omitted all details of the predicate convictions.[30] Any potential undue prejudice was ameliorated by (1) sanitizing the evidence to omit all details of the offenses; and (2) instructing the jury with CALCRIM No. 1403, telling jurors they "may not conclude from [gang] evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

G.   *The Trial Court Did Not Err in Allowing Evidence of Police Contacts with Daniel and Elias*

1.   *Additional Background*

In a police interrogation on September 15, Elias denied being friends with Daniel and denied having any contact with him for years:

---

[30]   The following is representative of the testimony on each of the six predicates:

"Q: People's 110, Fermin Barrera, case ending 213. There's a certified change of plea for . . . section 245[, subdivision] (a)(1), assault with a deadly weapon. Is this a case that you're also familiar with?

"A: Yes, it is.

"Q: . . . [B]ased on your knowledge of this case and Mr. Barrera, is Mr. Barrera a Center Street gang member?

"A: Yes, he is."

76

"[Q]: . . . [Y]ou know Daniel[,] right?

"[A]: Daniel? [¶] . . . [¶] What Daniel?

"[Q]: Daniel Ramos.

"[A]: Mmm I went to school with him. . . . [¶] . . . [¶] . . . I don't talk to him. . . . [¶] . . . [¶] It's been a couple years bro.

"[Q]: A couple years?

"[A]: Yeah. [¶] . . . [¶]

"[Q]: Okay. Um, so in my opinion a couple years is two years. Is that what you think a couple is[,] two?

"[A]: Mmm I don't know man[,] more. Just don't even hang out no more.

"[Q]: So it's been more than two years? So you're saying it's been what[,] three years? Four years?

"[A]: Oh yeah, about that.

"[Q]: Give me a number.

"[A]: Probably three. [¶] . . . [¶]

"[Q]: Do you know the name Kieto?

"[A]: No."

Before trial, the prosecutor asserted that evidence of police contacts with Daniel and Elias was "relevant especially since they both say that they haven't seen or talked to each other for quite a number of years . . . ." However, the court cautioned not to "have a whole lot of officers traipsing in here individually saying, 'I contacted him here with this person' . . . ." The prosecutor assured the court, "I don't plan to bring in the 20 or so witnesses who are on my witness list for FI [field interview] purposes only."

77

Consistent with this ruling: (1) Officer Wilson testified that he conducted a traffic stop on July 10, 2012 in the Center Street area. Elias was driving and Daniel was a passenger. (2) Lieutenant Valdovinos testified that on June 5, 2015, he conducted a traffic stop in the Center Street area of a vehicle in which Daniel and Elias were both passengers. In the rear seat with Elias was "Center Street gang paraphernalia"—a hat with a "C" on it. (3) Officer Weber testified that in four years working in the gang suppression unit, he had contacted Elias "hundreds of times." Weber testified that on September 15, 2015, he conducted a traffic stop at about 10:00 p.m. in the Center Street area. After the vehicle pulled over, a passenger door opened and someone with a bandanna covering his face and wearing dark clothing ran hunched over "as if they had a big weight in their waistband," indicative of someone carrying a weapon. Officer Weber "thought it was Elias Ramos." Daniel was in the backseat. The person who fled was never caught; however, police found a bandanna in the backseat near where Daniel had been sitting. (4) Officer Flores testified that on June 22, 2015, he saw Elias with Daniel and a third person in the Center Street area. Next to Elias was a hat with a "C," indicating Center Street gang membership. Elias claimed to have "found" the hat. On cross-examination, the officer testified that he saw Elias in November 2014, but not with Daniel, and he had no information with him about Elias and Daniel being together in 2016.

2. *No Error As to Three of the Four Contacts*

Daniel contends that Officer Weber's testimony that Elias ran from a vehicle wearing a bandanna and carrying a gun should have been excluded as being "highly prejudicial" and remote in time. We disagree. The incident occurred only one year before the charged offenses and therefore is relevant to the defendants' association with each other, as well as contradicting Elias's

78

claim that he had not seen Daniel since 2013. Moreover, as the People asserted in their trial brief, in "*Blue, That's How We Do It*," Elias sings about fleeing from police because he is " 'rolling' 'hot' "—i.e., having a weapon in a vehicle. Officer Weber's testimony was relevant to show Elias's lyrics depict actual events.

In a related argument, Daniel contends that he never lied to police about his association with Elias. Therefore, he claims, evidence police had seen him with Elias, even if admissible to contradict Elias's statements, were not impeaching as to Daniel. However, the evidence was independently relevant to show close association between the codefendants and, therefore, identity.

3. *Allowing Evidence of the 2012 Contact is Error, but Harmless*

Daniel contends the trial court abused its discretion in allowing Officer Wilson's testimony because "[t]here is no probative value in a contact that occurred over four years before the murder." We agree. Evidence that Daniel and Elias were seen together in July 2012 does not logically tend to show that they together committed the instant offenses in September 2016. Moreover, the evidence does not impeach Elias's assertion that he had not seen Daniel since 2013.

However, under any standard, this error is harmless. Daniel's confession and incriminating statements were, as defense counsel said in closing argument, "the crown jewel of the People's case." The record leaves no reasonable doubt that the jury found defendants guilty on that basis and not because the jury learned that Daniel and Elias were together in 2012.

H. *There Was No Improper Character Evidence, and No* Sanchez *Error—and Even If There Were—There Was No Prejudice*

Olsen testified that he reviewed (1) "a gang documentation record of specific instances where Daniel . . . has been contacted with other Center

79

Street gang members"; and (2) "police reports historically that have talked about Daniel . . . within Center Street." These documents were part of the foundation for his opinion that Daniel is a Center Street gang member.

Citing Evidence Code section 1101, Daniel contends this "unnecessary character assassination" by "improper character evidence" violated his right to a jury trial and to due process.[31] However, Daniel forfeited this issue because trial counsel did not object on these grounds. (*People v. Medina* (1995) 11 Cal.4th 694, 729 [forfeiture for failure to object under Evid. Code, § 1101].) Anticipating that we might find forfeiture, alternatively Daniel asserts that counsel rendered constitutionally ineffective assistance by not objecting.

Daniel's ineffective assistance claim fails because he cannot establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed"].) Olsen did not "assassinat[e]" Daniel's character by testifying about Daniel's police contacts. Daniel quite effectively did that himself when he justified his killing Annebell by telling her cousin, "Shit happens, fool."

Citing *Sanchez*, *supra*, 63 Cal.4th 665, Daniel further contends that Olsen's testimony about his "gang documentation record" was improper "case-specific testimonial hearsay, violating the confrontation clause."

In *Sanchez*, *supra*, 63 Cal.4th 665, the California Supreme Court "held that, when any expert relates to the jury case-specific, out-of-court statements and treats the content of those statements as true to support the

---

31 "Evidence Code section 1101 generally prohibits the introduction of character evidence to prove a defendant's propensity to commit conduct on a specific occasion." (*People v. Escudero* (2010) 183 Cal.App.4th 302, 309.)

expert's opinion, the statements are hearsay and must either fall within a hearsay exception or be independently proven by competent evidence. [Citation.] Further, if the case is one in which a prosecution expert seeks to relate testimonial hearsay, there is a violation of the confrontation clause unless the witness testifies at trial or is unavailable and the defendant had a prior opportunity to cross-examine the witness." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 166 (*Garcia*).)

" 'Since *Sanchez*, California appellate courts have held that expert testimony about "the general attributes of the . . . gang, such as the gang's culture, the importance placed on reputation and guns, . . . the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, [are] permissible as expert background testimony." ' [Citation.] A gang expert may testify about the history and founding of a particular gang, even if the sources of the information are hearsay." (*Garcia*, *supra*, 46 Cal.App.5th at p. 167.) However, "an expert may not relate case-specific testimonial hearsay, such as information contained in police reports authored by other officers. [Citations.] [¶] A gang expert who has personal knowledge of the facts and is subject to cross-examination at trial may testify to facts contained in documents that would otherwise be considered testimonial hearsay, such as field identification cards. [Citation.] Testimony by an officer about personal observations made by that officer, such as of an individual's tattoos, location, companions, or clothing, are not hearsay and thus do not run afoul of the confrontation clause." (*Ibid*.)

Daniel is correct that Olsen's testimony was based on case-specific hearsay to the extent Olsen relied on Daniel's "gang documentation record" and the "police reports" linking him to Center Street. However, as explained

below, there was no error in admitting Olsen's expert opinion because it was also based on proper nonhearsay evidence.

Olsen patrolled Oceanside gang territories and interviewed witnesses, victims, and suspects of Hispanic gang violence.[32]  He talked with gang members "regularly" and had "personally contacted" Daniel and Elias.  In forming his opinions, Olsen listened to portions of Daniel's recorded conversation with the CI, as well as some of Daniel's recorded jail telephone calls.

Thus, the foundation for Olsen's expert opinion was a combination of (1) inadmissible hearsay of contacts by other officers; (2) admissible evidence of Olsen's personal contacts; and (3) admissible evidence (falling within hearsay exceptions for party admissions and declarations against penal interest) of Daniel's statements to the CI.

After laying this foundation, the prosecutor asked Olsen, "*Based on your knowledge* of Daniel Ramos, do you believe him to be a Center Street gang member?"  (Italics added.)  Olsen testified, "Yes, I do."

In this usage, "knowledge" is ambiguous.  It could reasonably be construed to mean Olsen's personal knowledge and admissible hearsay.  But it could also reasonably be interpreted to mean knowledge derived, at least in part, from inadmissible evidence.  Because there was no contemporaneous objection, we cannot determine what Olsen understood "knowledge" to mean.  Where, as here, "the record is unclear about the basis of a witness's testimony, and the appellant did not seek at trial to develop the record, reviewing courts will not presume a violation of the confrontation clause."

---

[32]    Olsen explained that "[g]angs are kind of designated by race," two detectives are designated to investigate all Hispanic gangs, and his specialization includes the Center Street and Posole areas of Oceanside.

(*Garcia*, *supra*, 46 Cal.App.5th at p. 167.)  Accordingly, we conclude there was no *Sanchez* error.

In any event, even assuming there is error, it is harmless.  When the CI entered the cell, Daniel spontaneously introduced himself saying, "I'm Kieto, Center Street gang."  Given Daniel's self-identification, evidence of police contacts with Daniel could not have affected the verdicts.

I.     *The Trial Court Erred in Allowing Expert Opinion on Truthfulness; However, the Issue Is Forfeited and, in Any Event, the Error Was Harmless*

Olsen testified that surreptitiously recorded conversations between gang members reveal the truth because "you get them in their most genuine state as a gang member."  Without objection or motion to strike, Olsen added, "I mean you're hearing the truth right there."  Citing *People v. Sergill* (1982) 138 Cal.App.3d 34 (*Sergill*), Daniel contends an expert may not opine on credibility.  We agree; however, the error was not prejudicial.

In *Sergill,* police officers interviewed a child who had allegedly been sexually abused.  The trial court permitted the officers to testify that they believed that the child was being truthful when interviewed.  (*Sergill*, *supra*, 138 Cal.App.3d at p. 38.)  The Court of Appeal held this evidence was inadmissible, stating:

> "We find no authority to support the proposition that the veracity of those who report crimes to the police is a matter sufficiently beyond common experience to require the testimony of an expert.  Moreover, even if this were a proper subject for expert testimony, nothing in this record establishes the qualifications of these officers as experts.  The mere fact that they had taken numerous reports during their careers does not qualify them as experts in judging truthfulness."  (*Id*. at p. 39.)

*Sergill* also holds that such evidence is not admissible as lay opinion. (*Sergill*, *supra*, 138 Cal.App.3d at p. 40.)

Daniel is correct that Olsen's statement—"I mean you're hearing the truth right there"—is inadmissible. Like the officers testifying in *Sergill*, the police detective here was not qualified to testify as an expert on any witness's truthfulness or credibility. (*Sergill*, *supra*, 138 Cal.App.3d at p. 39.) However, defense counsel did not object on this ground and, therefore, the point is forfeited. (*People v. Dowl* (2013) 57 Cal.4th 1079, 1082.)

Anticipating that a direct challenge would be forfeited, Daniel contends his attorney was prejudicially ineffective for failing to object. "When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Daniel has not established that counsel's failure to object was constitutionally deficient. Olsen's testimony—"you're hearing the truth"

when eavesdropping—is common human experience.  The tendency of people to speak truthfully in that setting is precisely why police surreptitiously record jail phone calls and use undercover jail informants.  Trial counsel may have reasonably determined that Daniel's interests were best served by letting the point pass without emphasizing it by objecting.  (*People v. Kelly* (1992) 1 Cal.4th 495, 540 ["An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel."]; see *People v. Milner* (1988) 45 Cal.3d 227, 245 [finding no ineffective assistance of counsel where even if the prosecutor's statements were improper, counsel would have acted within the bounds of reasonable competence by ignoring the statements rather than drawing attention to them by objecting], overruled on other grounds in *Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.)

Even assuming that counsel's failure to object was constitutionally deficient, Daniel's claim independently fails because there is no conceivable prejudice.  Olsen's point reflects common sense.  Moreover, the trial court instructed jurors with CALCRIM No. 105, stating in part:  "You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience."  The court also gave CALCRIM No. 332:  "Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide. . . .  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  The court instructed jurors to reach their own conclusions as to whether the recorded conversations were credible.  We presume jurors follow the court's

instructions (*People v. Holt* (1997) 15 Cal.4th 619, 662), and Daniel cites nothing in the record indicating otherwise.

J.    *The Trial Court Did Not Abuse Its Discretion in Allowing Evidence of Elias's Chat Messages*

1.    *Additional Background*

Erik Ellgard, an Oceanside police detective with experience in gang suppression, identified a photograph of Center Street gang member Brian Arroyo that police found on Elias's phone.  Ellgard identified another photograph depicting Elias with a revolver.  Elias saved the photograph to his phone on September 11 (eight days after the shooting).  Within a few hours, Arroyo sent a Facebook message to Elias stating, "Yo, what up?  Bring my thing up."

Ellgard testified, "So being that it was only two and a half hours after that picture was saved to his phone, he's saying, 'yo, bring that thing up,' so in my opinion 'that thing' was that firearm that he was . . . [wearing] in his waistband in that picture."  Ellgard added that when gang members communicate with each other on social media, they "never" use words like "firearm and gun."  Ellgard testified that in his experience, gang members say "bring my thing," meaning to bring a "gun or firearm."

2.    *Hearsay Issue Forfeited*

Daniel contends that Ellgard's testimony about the chat is inadmissible hearsay.  Although Daniel concedes that trial counsel did not object, he contends the omission should be excused because an objection "would have been futile," or alternatively, that counsel's failure to object constituted ineffective assistance.

The issue is forfeited for lack of objection.  (*People v. Stevens* (2015) 62 Cal.4th 325, 333.)  Moreover, there is no basis for determining that an objection would have been futile.  In arguing futility, Daniel points to hearsay

objections made and overruled earlier during Ellgard's testimony. For example, Ellgard testified that Arroyo sent a message to Elias on September 3 (the day of the shooting) at 5:37 a.m. stating, "Hey, where you at?" The court overruled a hearsay objection on the grounds that the evidence was admissible for a nonhearsay purpose—"to see what the response would be or if there is a response." Ellgard also testified about another message from Arroyo to Elias on the same date stating, "Hey, where you at, Azul[ ]." Again the court overruled a hearsay objection on the grounds that the evidence was admissible for the nonhearsay purpose of "whether or not there's a response and who it's directed to."

Daniel contends that because the court overruled these two hearsay objections, it would have been futile to object again when the prosecutor asked Ellgard about the message, "Yo, . . . [b]ring my thing up." However, Daniel's argument overlooks a key distinction. Elias told police that when Annebell was shot, he was sleeping with his girlfriend at his house. The two chat messages Arroyo sent on the date of the shooting, one of which was in the early morning hours, are relevant for the nonhearsay purpose of showing whether Elias responded at a time when he claimed to police he was asleep.

In contrast, and as Daniel concedes, "Yo, . . . [b]ring my thing up" was offered for the truth of the matter asserted—i.e., Elias had Arroyo's gun (or the gang's gun). Accordingly, that the court overruled previous hearsay objections because that evidence was not offered for a hearsay purpose would not have made a hearsay objection here futile—this evidence was offered for the truth of the matter asserted.

Daniel's claim of ineffective assistance fails because there could have been no prejudice. The gist of Ellgard's hearsay testimony was that Elias possessed a revolver close in time to the shooting. However, the jury heard

87

much more pointed evidence when Daniel confessed to killing Annebell with a revolver.

K.     *There Was No Prejudicial Prosecutorial Misconduct*

Daniel contends the prosecutor committed misconduct by "[1] using a flawed and misleading analogy to explain premeditation and deliberation, [2] appealing to the jurors' passions and sympathy, [3] misstating the evidence, and [4] improper vouching." Elias separately asserts that the prosecutor "committed misconduct" by misstating the law in telling the jury that it "need only find that Daniel premeditated and deliberated the crimes for the allegation to be found true for both defendants."

1.     *The Prosecutor's Analogy to Explain Premeditation and Deliberation Was Not Improper*

In closing argument, the prosecutor explained premeditation and deliberation by analogy to a driver confronted with a yellow traffic light, stating:

> "Deliberate, a considered choice. Should this person live? Should this person die? This person should die. [¶] And premeditated is just beforehand. That's all it is. It's that simple. [¶] And as the instructions the judge read you will say, that cold, calculated decision can be reached quickly. The test is the extent of reflection, not the length of time.
>
> "Premeditation, deliberation, willful is something—you've done it on your way over here if you drove here. You've done it in your lives if you've seen a yellow light. Should I stop? Should I go through the intersection; right?
>
> "You think about it. You consider it. You deliberate. It's a quick decision, but you made that decision ahead of time, and you took either—whatever the right choice happens to be, go through or stop; right?"

88

Daniel contends the prosecutor misstated the law because "telling the jury deliberation and premeditation is like driving through a yellow light is at odds with the very meaning of those words."

" '[T]o establish reversible prosecutorial misconduct a defendant must show that the prosecutor used " 'deceptive or reprehensible methods' " and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] A prosecutor's misconduct violates the federal Constitution if the behavior is " ' " ' " ' " ' "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " ' " ' " [Citation.] A prosecutor has wide latitude during closing argument to make assertions of common knowledge or use illustrations based on common experience. [Citations.] But in relating the jury's task to a more common experience, the prosecutor "must not imply that the task is less rigorous than the law requires." [Citation].' " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1085 (*Wang*).)

" 'When attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' " (*Wang, supra,* 46 Cal.App.5th at p. 1085.)

Daniel's argument fails for two reasons. First, trial counsel did not object. "To preserve a claim of prosecutorial misconduct on appeal, ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety." ' " (*Fayed,*

*supra*, 9 Cal.5th at p. 204.)[33]  Where there is no objection, the claimed misconduct may be reviewed, but only if an objection would have been futile or if an admonition would not have cured the harm.  (*Ibid*.)  Neither exception existing here, Daniel has forfeited the issue.

Moreover, the analogy was not improper.  The prosecutor in *Wang*, *supra*, 46 Cal.App.5th 1055 used a nearly identical analogy, stating:

> " 'You have a decision to make, "do I step on the accelerator and fly through this intersection because I can't wait, or do I slam on my brakes and stop?"  You have to decide, and when you're making that decision—do I go or do I stop— you're evaluating things.  "If I go, are there pedestrians?  Is there a cop around?  Am I going to get a ticket?  Is there a car that's going to pull out in front of me and cause an accident?  If I slam on my brakes, am I going to end up in the middle of the intersection, or do I have enough space to stop?  Am I going to be okay?"  [¶]  You may not verbally say this to yourself.  That's crazy.  No one is going to be driving going, "Okay.  Should I stop?  Should I not?  I don't know.  Let's think."  No.  This happens so quickly.  It happens so quickly, but in your mind, you quickly evaluate those things, and you decide and you act.  That is premeditation and deliberation.  It can happen that fast. You just have to consider the consequences.  You just have to weigh the pros and cons, things for and against it, and decide to act.  That's what premeditation and deliberation . . . is.' "  (*Wang*, at p. 1084.)

---

[33]  Daniel further asserts that even if forfeited, we should exercise discretion to consider the issue because "the misconduct implicates Daniel's constitutional rights," failing to object can be excused in a "closely balanced" case where the misconduct "contributed to the verdict," an objection would have been "futile[ ] and an admonition would have been insufficient to cure the harm," and counsel was ineffective for failing to object.  Because the prosecutor's explanation of premeditation and deliberation was not misconduct or error, it is unnecessary to address these subsidiary claims.

*Wang* held that this analogy is "consistent with the law." (*Wang*, *supra*, 46 Cal.App.5th at p. 1085.) The appellate court noted that in *People v. Avila* (2009) 46 Cal.4th 680 (*Avila*), the California Supreme Court rejected a misconduct claim where the prosecutor used a similar analogy. (*Wang*, at p. 1086.)

Attempting to distinguish *Avila, supra*, 46 Cal.4th 680, Daniel contends that the prosecutor there emphasized that deciding to kill is only "similar" to deciding whether to drive through a yellow light, whereas here the prosecutor "made no similar disclaimer." However, the prosecutor did not equate the gravity of deciding to kill with deciding whether to drive through a yellow light. Rather, he used the illustration to show that a quickly made decision may still involve deliberation. Moreover, here the prosecutor's closing argument also included a list of Daniel's and Elias's deliberate and premeditated acts: "You wear masks. . . . You go to a place you shouldn't be, rival gang territory. You're armed." Accordingly, given the prosecutor's emphasis on the amount of reflection that occurred before the shooting, there is no reasonable likelihood the jury construed the traffic light illustration in an improper or erroneous manner. (*Wang, supra*, 46 Cal.App.5th at p. 1086.)

2.  *The Prosecutor Erred in Appealing to Jury Sympathy and Stating Facts Not in Evidence; However, the Error Was Not Prejudicial*

Daniel contends the prosecutor committed misconduct by appealing to the jury's sympathy and passions, and by referring to facts not in evidence by telling jurors to view events through Annebell's perspective:

> "I put Annebell's picture up. Why? Because we spent so much time, so much of the time, talking about these two defendants, who they are and what they did, we sometimes lose sight of the reality.
>
> "The reality is because of their violent ways, they left Annebell in a crawl tube, in a kid's crawl tube, to die.

91

"We forget *from her perspective*, because she's not here to tell us, what? The last thing she saw, the same two guys we've been looking at for the last week.

"She sat there on the edge of a crawl tube on that jungle gym. She looked over. *What a terrifying thing to see*: These guys masked up in bandannas armed getting ready to kill her.

"She did what she could. She was trapped. She was vulnerable. She's stuck. [¶] You've seen the jungle gym. [¶] She was caged in almost, and she did the best thing, the most logical thing she could do. She jumped into the crawl tube and she laid down, a kid's crawl tube, a little green space where kids run in and out every day." (Italics added.)

"Although a prosecutor may vigorously argue the case, appeals to sympathy for the victim during an objective determination of guilt fall outside the bounds of vigorous argument." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 920 (*Amezcua and Flores*).) Accordingly, " '[a]s a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' " (*Fayed*, *supra*, 9 Cal.5th at p. 205.)

For example, in *People v. Seumanu* (2015) 61 Cal.4th 1293 (*Seumanu*), in closing argument the prosecutor stated, " 'Imagine begging for your life, begging to be let go, being held captive at the end of a shotgun by these four frightening men, and they get mad at you because you only have a little cash,' " and " 'Imagine trying to save your own life, giving them the most you can give them, and you are being called a liar and having a gun pointed at you.' " (*Id.* at pp. 1343-1344.) The California Supreme Court held that the prosecutor's argument "improperly asked the jury to view the crime through [the victim's] eyes." (*Id.* at p. 1344.)

Similarly here, the prosecutor asked the jury to consider the case from Annebell's "perspective." Like the prosecutor in *Seumanu*, *supra*, 61 Cal.4th 1293, the prosecutor asked jurors to put themselves in the victim's shoes: "What a terrifying thing to see: These guys masked up in bandannas armed getting ready to kill her." "[A]sking jurors to 'imagine the thoughts of the victims in their last seconds of life' is rarely a relevant inquiry at the guilt phase." (*Fayed*, *supra*, 9 Cal.5th at p. 205.)

Nevertheless, defendants failed to object to the prosecutor's remarks. The claim is forfeited. (*People v. Hinton* (2006) 37 Cal.4th 839, 863.)

Framing the argument as ineffective assistance of counsel (by failing to object) is also unavailing. In light of Daniel's confession that he killed Annebell with a .22-caliber handgun, the error is harmless. (*Fayed*, *supra*, 9 Cal.5th at p. 205; *People v. Young* (2019) 7 Cal.5th 905, 933 [finding "no reasonable probability that the prosecutor's fleeting remark had any effect on the jury, particularly given the overwhelming evidence of defendant's guilt"]; *Seumanu*, *supra*, 61 Cal.4th at p. 1344 [finding the misconduct harmless because of "strong evidence" of guilt]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1407 [same].) "Based on that want of prejudice, defendants' claim of ineffective assistance of counsel in failing to object to the remarks lacks merit." (*Amezcua and Flores*, *supra*, 6 Cal.5th at p. 920.)

Daniel further contends the prosecutor improperly made "inflammatory arguments 'aimed at arousing the passion or prejudice of the jury' " by asking the jury to " 'hold [Daniel and Elias] responsible for the murder and attempted murder that they committed' " and stating that there was " 'poetic justice' " in returning a verdict that means, " 'we know what you did and we're not going to let you get away with it, because you know what? Center

93

Street might have been more important to you than Annebell's life, but that's not right.' "

However, this too is forfeited by failing to object. In any event, the argument lacks merit. Although it is improper for a prosecutor to make emotional arguments and use " ' "inflammatory rhetoric" ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742-743), urging jurors to hold defendants responsible for their conduct is neither emotional nor inflammatory. As long as the prosecutor does not urge the jury to render a verdict based on community sentiment or some other matter unrelated to the evidence, the prosecutor may generally comment on the danger to the community created by criminal conduct and remind the jury of its important role in the criminal justice system. (See *People v. Adanandus* (2007) 157 Cal.App.4th 496, 513 [collecting cases, no misconduct where prosecutor urged the jury to do "the right thing" and "to make a statement"].)

### 3. *The Prosecutor Did Not Misstate Evidence*

A prosecutor commits misconduct by arguing facts not in evidence during closing argument " 'because such statements "tend[ ] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' " ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

### a. *The Prosecutor Did Not Misstate Evidence of Julye's Identification*

In closing argument, the prosecutor told the jury that "at one point" Julye identified Kieto and "a shorter guy" as the shooters:

"Julye doesn't want to talk to police. He doesn't like the police. We know what his attitude is towards the police. That's the code he lives by, the rules he lives by within Posole.

"He does during one of the interviews. And coincidentally in July of last year, sign this and agrees that Kieto to the extent he saw Kieto—cause at one point he says he saw his face and then he saw—he said he saw part of his face, enough to say it was Kiets or Kieto. There was a shorter guy with him right beside him. Annebell was right in the center there and he was in this area somewhere. [¶] He committed to that."

Although defense counsel did not object, on appeal Daniel contends the prosecutor misstated evidence because "Julye testified he did not think he said those things or did not remember" and Julye "never 'committed' that he identified Kieto during the interview." To avoid forfeiture by failing to object, Daniel contends counsel rendered ineffective assistance.

Daniel is correct that *at trial*, Julye retracted his statements implicating Daniel and Elias, and claimed, "I just made all that up." However, here the prosecutor was not referring to Julye's trial testimony. Rather, he was referring to Julye's recorded jail conversation with JoJo, which is in evidence. In that conversation, Julye said that Daniel pulled down his bandanna, and Julye saw his face and recognized him as Kieto, i.e., Daniel. Julye also said that Kieto had "a little snub," a revolver, and that Daniel was with "the short fool," i.e., Elias.[34]

The prosecutor did not misstate the evidence because he prefaced these remarks by saying, "*at one point . . . .*" At one point—i.e., in his recorded

---

[34] The prosecutor told the jury, " 'Shorter guy' is not much; right? But when Kieto . . . is only about 5'6 or 5'7, 'shorter guy' means something; right? How many other gangsters are running around doing violent things who are shorter than that?" Elias stands five feet, four inches tall.

conversation with JoJo—Julye said he saw Daniel's face. Moreover, in stating that Julye had "committed" himself to this identification, the prosecutor was drawing the reasonable inference that when making these statements, Julye had no motive to lie. The argument was a fair comment on the evidence and whether the inference was reasonable was for the jury to decide. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

> b. *The Prosecutor's Rebuttal Argument Did Not Misstate Evidence of the CI's Experience*

In closing, defense counsel characterized the CI as being "very experienced" and "knows how to put these youngsters in their place to make him get respect." Addressing this point in rebuttal, the prosecutor stated, "Experienced CI. [¶] This was the CI's first time doing this, if you recall. . . . [¶] This was—he's done others since, but this was the first time." For the first time on appeal, Daniel contends the prosecutor's remarks misstate evidence because Garcia testified that the CI was paid about $40,000 between 2015 and 2018 for other operations.

Apart from the forfeiture that results from trial counsel's failure to object, the argument also lacks merit. Daniel is correct that the CI had done other operations. However, the challenged portion of the prosecutor's rebuttal argument is not clearly contradictory. The prosecutor said it was the CI's "first time doing *this*." (Italics added.) If "this" means an in-custody operation working with Garcia, the argument is consistent with this portion of Garcia's testimony:

> "Q: And was this the very—the first time you and the CI had worked in an in-custody jail operation?

> "A: It's the first time that we worked in an in-custody operation, yes, sir."

96

Conversely, if by "this" the prosecutor meant covert operations in general, then it does misstate evidence. Because trial counsel did not object on these grounds, the prosecutor had no opportunity to clarify. "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

Mindful of this standard, we construe "first time doing *this*" to be consistent with Garcia's testimony that it was "the first time that [they] worked in an in-custody operation" and, therefore, there was no misconduct. And even if there was misconduct, there is no conceivable prejudice. The jury heard the recorded conversation and could draw its own conclusions about whether the CI unduly manipulated Daniel to elicit certain responses.

4.    *The Prosecutor Did Not Vouch for Witnesses*

"It is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] . . . The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

Daniel contends the prosecutor improperly vouched for witnesses' credibility by "repeatedly saying, 'we know' and 'we see' when discussing their testimony." For example, in closing argument the prosecutor stated:

97

"Two guys, Daniel and Elias Ramos.  We know them.  We know who they are.  We know what they did, why they did it.  [¶] . . . [¶]

"What did we see?  We see them for who they really are. We see their faces.  We know their names.  We know what they did.  [¶] . . . [¶]

"We know who did [it].  [¶] . . . [¶]

"Both premeditated this murder.  [¶]  And even if you feel that Daniel was the only one that premeditated the murder, this one interestingly enough doesn't require both of them premeditate together.  We know they did . . . ."

In rebuttal, the prosecutor again used "we," stating, "Now that we know all the evidence, they're implicating each other."

The underlying premise of Daniel's argument is that when the prosecutor used "we," he meant (1) himself and the jurors; or (2) the office of the district attorney.  Daniel asserts that by "repetitiously using 'we' . . . [the prosecutor] urged the jurors 'to rely on the government's view of the evidence' instead of independently assessing whether the crimes and allegations were proven beyond a reasonable doubt."

However, a more plausible and benign interpretation is that the prosecutor used "we" as a plural second person, referring only to the jury. For example, it is not uncommon for a server at a restaurant to greet diners by saying, "How are *we* doing over here?"  The server obviously means, "How are *you* (plural) doing?"  Similarly, it is not uncommon for someone to say to a small group, "Aren't *we* looking great today?"—referring only to the group. Elsewhere in closing argument, the prosecutor used "we" in this sense, as a pronoun referring only to the jurors:  "With your verdict, you're going to say a couple things.  You're going to say *we* know what you did and *we're* not going to let you get away with it . . . ."  (Italics added.)  The most reasonable

interpretation of the prosecutor's use of "we" is therefore a reference to the jurors.

Of course, if trial counsel had objected, the prosecutor could have clarified his intended meaning, thereby avoiding this entire issue—which is precisely why such challenges are forfeited on appeal by failing to object. Even if not forfeited, there is no misconduct. The prosecutor's use of "we" is ambiguous at worst. We will not presume the jury drew the most damaging meaning. (See *Centeno*, *supra*, 60 Cal.4th at p. 667.) Daniel has not demonstrated a " ' "reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Shazier* (2014) 60 Cal.4th 109, 144.)

> 5. *The Prosecutor Did Not Misstate the Law Regarding Premeditated Attempted Murder*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*).) "[U]nlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605; see also § 664, subd. (a).)

An aider and abettor is subject to this sentencing enhancement where the perpetrator attempted a willful, deliberate, and premeditated murder even though the accomplice did not personally deliberate or premeditate. (*Lee*, *supra*, 31 Cal.4th at pp. 624-625; *People v. Favor* (2012) 54 Cal.4th 868, 877-878.) The accomplice must still share the intent to kill. (*Lee*, at pp. 623-624.)

In closing argument, after discussing the premeditated murder charges, the prosecutor directed the jury's attention to the attempted murder count and without objection stated:

> "Attempted murder. [¶] . . . [¶] Both are responsible for attempted murder of Julye R[.]
>
> "Once you find the gang allegation to be true, consider: Was this premeditated? The same definition we used for first degree murder . . . . Same rules here apply for attempted murder.
>
> "Both premeditated this murder.
>
> "And even if you feel that Daniel was the only one that premeditated the murder, [*sic*] this one interestingly enough doesn't require [that] both of them premeditate together. We know they did, but that's just a rule with this allegation."

Elias asserts that the prosecutor's argument erroneously "conveyed that the jury need only find that Daniel premeditated and deliberated the crimes for the allegation to be found true for both defendants." Elias further contends that if the issue is forfeited by trial counsel's failure to object, we should nevertheless reach the merits on ineffective assistance of counsel grounds.

The prosecutor did not misstate the law because when the argument is read in context, as it must be, it is clear the prosecutor was referring only to the attempted murder count. First, this argument immediately follows the prosecutor's discussion of first degree murder. Marking a turning point and new topic, the prosecutor said, "Attempted murder." Thus, the jury would reasonably understand the next assertions to pertain only to the attempted murder count. Second, in discussing attempted murder, the prosecutor drew the correct distinction, telling the jury that unlike the murder count he had

100

just discussed, "this one"—i.e., attempted murder—"interestingly enough doesn't require [that] both of them premeditate together."

L.    *No Cumulative Error*

Under the "cumulative error" doctrine, " 'a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 523.)  Daniel contends that when considered together, the "errors involving Daniel's statements to the informant, coupled with the egregious prosecutorial misconduct and erroneous admission of the inflammatory evidence" denied him a fair trial.

"There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  As explained *ante*, the court did not err in allowing evidence of Daniel's statements to the CI, nor was there any "egregious prosecutorial misconduct" or "erroneous admission of . . . inflammatory evidence."  As such, Daniel's claim of cumulative error fails.

Nevertheless, the trial court did err in erroneously admitting evidence that (1) Daniel and Elias were contacted by police in 2012; and (2) in Olsen's opinion, gang members are truthful in surreptitiously recorded jail conversations.  The prosecutor also erred in closing argument by asking jurors to view the case through Annebell's eyes.

Liberally construing Daniel's cumulative error argument to include these errors, there is no cumulative prejudice.  The two evidentiary errors are insignificant.  That leaves the prosecutor's improper argument urging jurors to stand in the victim's shoes.  That error is more troubling because it appeals to the jurors' emotions.  However, Daniel confessed to a deliberate and premeditated murder.  He also named Elias as an aider and abettor.  Daniel's

confession and incriminating statements are so powerfully condemning, errors in this trial, even viewed cumulatively, were harmless under any applicable standard, even beyond a reasonable doubt. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [error is reversible if there is a reasonable probability that a result more favorable to defendant would have been reached in absence of error]; *Chapman v. California* (1967) 386 U.S. 18, 26 (*Chapman*) [where applicable, reversal is mandated unless the court finds the error was harmless beyond a reasonable doubt].)

M.    *The Judgment Is Supported by Substantial Evidence*

We next consider Elias's challenge to the sufficiency of the evidence to support the verdict in two respects. Specifically, Elias contends the evidence is insufficient to support the jury's findings that he aided and abetted murder and attempted murder and to support the jury's true findings on the gang enhancements.

1.    *The Standard of Review*

In considering a challenge to the sufficiency of the evidence, we " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 168.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court ' " 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.) We "must accept the fact finder's resolution of conflicting evidence; and [we] may not insert [our] own views regarding the credibility of

102

witnesses in place of the assessments conveyed by the judgment." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008.)

2. *Substantial Evidence of Aiding and Abetting Premeditated Murder and Attempted Murder*

In challenging the sufficiency of the evidence to support a finding that he aided and abetted murder and attempted murder, Elias claims there was "no evidence [he] intended to kill anyone or knew that Daniel intended to kill someone, or did anything to facilitate the crimes." Elias asserts, "There [is] *no evidence* [Elias] helped Daniel do *anything*." (Italics added.)

a. *Legal Principles, Aider and Abettor Culpability*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) If the murder is "willful, deliberate, and premeditated," it is first degree murder. (§ 189, subd. (a).) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*Lee, supra*, 31 Cal.4th at p. 623.)

For both murder and the sentencing enhancement for attempted murder, " ' " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Potts, supra*, 6 Cal.5th at p. 1027; see also § 664, subd. (a) [defining "willful, deliberate, and premeditated murder" for the

103

purpose of the attempted murder sentencing enhancement by incorporating that concept from the crime of first degree murder in § 189].)

"We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' [Citation.] If the evidence of preexisting motive and planning activity by itself is sufficient to support the first degree murder conviction on a theory of premeditation and deliberation, we need not review the evidence concerning the manner of killing." (*People v. Jennings* (2010) 50 Cal.4th 616, 645-646.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*People v. Romero* (2008) 44 Cal.4th 386, 401.)

" 'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) "Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) "[N]either presence at the scene of a crime nor knowledge of, but failure to

104

prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Under the direct theory of aiding and abetting applied in this case, "the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

      b. *Analysis*

      There is substantial evidence identifying Elias as the person with Daniel at the Park. Indeed, Daniel himself made that identification when speaking to the CI, identifying Elias as his "homie" known as "Blue." Daniel told the CI that his homie drove them near the Park and was with him during the shooting. Daniel also told the CI that Elias is his "roll dog,"—i.e., a fellow gang member in a close relationship, who commits crimes with him. Speaking of the shooting, Daniel said "everyone knows right there in my hood" that "it was me with my homie." Julye also identified Elias, telling JoJo that the person next to Daniel was the "shorter guy."

      There is substantial evidence that Elias knew Daniel's unlawful intent to kill, intended to assist in such killing, and acted to assist in committing the crimes. In the weeks leading up to the shooting, Elias twice had his girlfriend drive him to the scene. The jury could reasonably infer that Elias was scouting the Park, planning entrance and exit routes. Daniel used a .22-caliber revolver. The jury could also infer that evidence linked Elias to that weapon both before and shortly after the shooting. A photograph on Elias's phone shows him with a revolver in his waistband. About a week after the murder, a gang member asked Elias to return the revolver depicted in the

photograph.  Moreover, a gun was brought to the Park.  Bringing a gun makes it " ' "reasonable to infer that [they] considered the possibility of homicide from the outset." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 [carrying a loaded gun shows the defendant had considered the possibility of a violent encounter].)

Moreover, Elias and Daniel traveled into rival gang territory to find victims.  This too demonstrates planning.  (See *People v. Wright* (1985) 39 Cal.3d 576, 593 [evidence of planning where defendant actively looked for victim before shooting him].)

Daniel and Elias each wore a bandanna over their faces.  Donning a mask to hide one's identity during a shooting shows premeditation and deliberation; it is inconsistent with acting rashly.  (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1595 [mask was evidence of planning, showing murder was premeditated and deliberate]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1146 [evidence to support first degree murder included that a group of gang members all wore masks "into the heart" of their rival gang's territory].)

Moreover, Elias had multiple opportunities to abandon the criminal venture and turn back.  Elias might have turned back after exiting the car near the freeway on-ramp.  He could have also stopped when he and Daniel were seen climbing the chain link fence.  The jury could thus infer that only a person already resolute on the use of deadly force would have proceeded with the planned shooting.  (See *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1116.)

There is substantial evidence not only of motive, but of a motive that involves deliberation.  Olsen testified that gang members gain respect by committing an act of violence for the gang's benefit.  Murdering a rival gang member achieves the highest form of such respect.  Moreover, even if a gang

member such as Elias does not shoot, but is present and works with the other gang member to commit the murder, that will bolster his gang status "just the same." This is substantial evidence not merely of Elias's motive to kill, but the kind of motive that " 'would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed." ' " (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268.)

Moreover, when interviewed by police, Elias repeatedly lied, evidencing a consciousness of guilt. Elias denied being "Blue," saying that he "never met him" but "heard he makes like songs and all that stuff that's it." He also denied knowing Daniel, stating that he "went to school with him. That's about it" and "I don't talk to him." Elias denied knowing the name "Kieto"— even though Elias refers to Daniel as Kieto in social media and in rap. Elias also lied by telling police he was asleep at his home with his girlfriend, Linda, when Annebell was murdered. Police could never locate any such Linda, nor was contact information for a Linda in Elias's phone. Although these lies, by themselves, are insufficient to prove guilt, when considered with other evidence, they show consciousness of guilt.

Additionally, a rap video police found on Elias's phone was dated August 28—about one week before the shooting. It provides further evidence of Elias's intent to kill. In that song, "*Blue, That's How We Do It,*" Elias states "it's Center Street gang comin' at you with the sickest, the realest about to kill it . . . aiming for the dome so you can fuckin' die slow and you know how we do it up in Center Street fool. Shout out to Kieto, . . . really got enemies on the run . . . ." Additionally, reflecting a similarity to the crimes charged here, Elias raps, "You know how we ride. You know how we ride, it's time to fuckin' ride. Let's go to the other side where all the fools they hidin'

107

where the fuck you at?" In another rap, Elias used a derogatory term for Posole gang members and sang that he would "crack [shoot] them on sight." There is substantial evidence supporting a determination that unlike commercial rap, Elias's rap depicted his criminal intent. The gang expert testified that gang members use rap as a personal diary.

Citing *People v. Rodriguez* (1986) 42 Cal.3d 730, Elias contends his "mere presence and inaction at the scene" is insufficient to convict as an aider and abettor. Relying on *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, Elias further contends "[i]t is not enough for the prosecution to demonstrate [the defendant] knew criminal activity was afoot" and "[t]here [is] no evidence [that Elias] helped Daniel do anything."

However, the evidence summarized above shows Elias's conviction is not based on "merely being present" at the scene and that he assisted Daniel in the shooting. Further, Olsen's expert testimony strengthened inferences arising from other evidence specific to Elias's role in the crimes. Olsen testified that Elias's presence contributed to the mission and aided its completion. Gang members will often have another member present to corroborate what occurred within the gang and to provide backup if rival gang members fight. Understood in that context, scouting the Park shortly before the shooting, driving Daniel and himself to the outskirts of Posole territory along with a .22-caliber revolver, covertly entering the Park, and wearing a bandanna and hoodie to conceal his identity support the inference that Elias was aware of the impending shooting, intended that it occur, and acted to facilitate it.

3.     *Substantial Evidence of the Gang Enhancements*

Elias also challenges the sufficiency of the evidence to support the true findings on the gang enhancements in each of the counts. As we will explain

below in section II.O, effective January 1, 2022, the substantive requirements for the gang enhancement described in section 186.22, subdivision (b)(1) have changed. (Stats. 2021, ch. 699, §§ 1-5.) Those statutory changes require that we reverse the true findings on the gang enhancements. Nevertheless, because double jeopardy would attach if Elias were to succeed in establishing that the jury's true findings on the gang enhancements were not supported by substantial evidence (*Burks v. United States* (1978) 437 U.S. 1, 18; *People v. Garcia* (2014) 224 Cal.App.4th 519, 526), we proceed to address Elias's sufficiency of the evidence challenge to those enhancements, based on the substantive requirements of section 186.22, subdivision (b)(1) at the time of trial.

The sentencing enhancement set forth in section 186.22, subdivision (b)(1) applies to "a person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Under the version of section 186.22 that existed at the time of trial, to establish a "criminal street gang," the prosecution had to prove that one of the gang's "primary activities" was the commission of one or more of the 33 crimes enumerated in section 186.22, subdivision (e), and that the gang engaged in a "pattern of criminal gang activity" by committing two or more such "predicate offenses." (Former § 186.22, subds. (e), (f).) The 33 crimes listed in subdivision (e) included the commission or attempted commission of murder, robbery, assault with a deadly weapon or by means likely to produce great bodily injury, and prohibited possession of a firearm. (Former § 186.22, subd. (e).) Case law interprets the phrase "primary activities" to mean that committing one or more of the enumerated crimes is one of the group's " 'chief' or 'principal'

occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)

Olsen testified that he was familiar with Center Street gang, having contacted its members throughout his 11-year career. Asked to identify "some of the general patterns" of Center Street's "criminal activity," Olsen testified: "Murder, assault with a deadly weapon, robbery, vandalism, possession of firearms."

Elias contends that because the prosecutor asked only about "general patterns" and not "primary activities," there was insufficient evidence that the gang had as one of its "primary activities" the commission of one or more of the crimes enumerated in former section 186.22, subdivision (e). We disagree. Although expert testimony may be sufficient to establish the "primary activities" element of the gang enhancement[35]—such testimony is not the exclusive means of doing so. " 'Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute.' " (*Nguyen, supra*, 61 Cal.4th at p. 1068, italics omitted.) Olsen testified that Center Street gang members collectively had six prior convictions, including (1) unlawful possession of a firearm (December 2015); (2) assault with a

---

[35] *People v. Prunty* (2015) 62 Cal.4th 59, 82 (gang expert's testimony of gang's "various criminal practices, including homicide, assault, and firearms offenses" was "likely sufficient" to establish primary activities element); *Nguyen, supra*, 61 Cal.4th at page 1068 (expert's testimony listing multiple crimes enumerated in statute as primary activities of gang provided sufficient proof of gang's primary activities); *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226 (*Vy*) ("proof of the 'primary activities' element was satisfied through testimony by a police gang expert" of gang's "criminal actions that constituted predicate crimes under the gang statute"). *Vy* was overruled on other grounds by *Sanchez, supra*, 63 Cal.4th 665, as recognized in *In re Thomas* (2018) 30 Cal.App.5th 744, 752-753.

deadly weapon (November 2015; June 2015; June 2011; November 2009); and (3) assault by means likely to produce great bodily injury (November 2015). Moreover, under the prior version of section 186.22, if the jury found defendants guilty of a crime charged in this case, the jury could also properly consider that crime in deciding whether Center Street's primary activities included committing that crime. (*Sengpadychith*, *supra*, 26 Cal.4th at pp. 320, 323.)

The appellate court's opinion in *Vy*, *supra*, 122 Cal.App.4th 1209, is illustrative. There, the court held that three violent crimes over a period of less than three months constituted sufficient evidence of a gang's primary activities. (*Id*. at pp. 1222, 1225.) Similarly here, evidence of Center Street gang members' convictions for five prior aggravated assaults, a firearm violation, plus the charged offenses, was sufficient to show that the gang had "as one of its primary activities[,] the commission of one or more" of the 33 criminal acts listed in former section 186.22, subdivision (e).

Elias contends, however, that *Vy*, *supra*, 122 Cal.App.4th 1209 is distinguishable because in *Vy*, the three predicate crimes were committed "over a short period of time" in a single year, whereas here the six convictions occurred over a six-year period by members of a group consisting of approximately 70 persons.[36]

Even assuming Elias is correct that—when considered alone—six convictions occurring between 2009 and 2015 suggested that Center Street's crimes were only occasional, we look to the record as a whole in evaluating a substantial evidence claim. This includes evidence that the six predicates were committed by six different Center Street gang members. Moreover, over a four-year period, police in the gang suppression unit contacted Elias

---

[36] Elias incorrectly states there are 100 Center Street gang members.

111

"hundreds of times." On a traffic stop about a year before the charged crimes, Elias fled on foot with a gun in his waistband. In 2016 rap, Elias stated that Center Street members were "rolling and patrolling," looking for rival gang members to kill. In other lyrics, Elias said that Center Street gang members were posted on the streets in their neighborhood, with access to weapons "in case the enemies roll by."

Thus, the record as a whole demonstrates that Center Street's primary purpose was to commit violent crime. The true findings on the gang enhancements were supported by substantial evidence.

N.    *Daniel Has Forfeited Issues Not Raised in His or Elias's Opening Brief*

On May 13, 2019, Daniel filed a 161-page opening brief. The argument section of that brief does not contain any separate heading or argument that Daniel's convictions and/or the true findings on enhancements are not supported by substantial evidence.

On August 6, 2019, Elias filed his opening brief. As discussed *ante*, among other points, Elias's brief asserts that the judgment against him is not supported by substantial evidence. Elias's brief presents these arguments only with respect to his case—not Daniel's.

On August 16, 2019, Daniel filed a six-page single-spaced letter brief in this court, entitled, "Notice Of Joinder . . . in Arguments Briefed By Coappellant Elias Ramos" (the Letter). The Letter was both unnecessary and somewhat puzzling. It was unnecessary because in his opening brief, Daniel had already joined in Elias's arguments. The Letter was puzzling because it does not take six single-spaced pages to say, "I join in Elias's arguments if they are helpful to me."

We subsequently issued an order limiting the Letter to being only a joinder in issues raised in Elias's opening brief: "The court has received

appellant Daniel Ramos's 'notice of joinder' in arguments of his co-appellant. The court construes the notice as a request to join in arguments raised in co-appellant Elias Ramos's opening brief and, as such, GRANTS the request."

In both the Letter and his reply brief, Daniel asserts that no substantial evidence supports findings that he premeditated and deliberated the murder and attempted murder, and that insufficient evidence supports the gang enhancements.

The arguments are forfeited for two reasons. First, Daniel cannot assert the issues by way of joinder because Elias's brief does not contain an argument that the evidence is insufficient against *Daniel*. Elias argues there was insufficient evidence of his *own* premeditation and guilt, and the true findings on the gang enhancements were made as to each defendant, but Elias challenges only the findings as to him. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 [joinder in coappellant's brief was not sufficient to raise issue of aider and abettor liability unique to appellant's own circumstances].) Our order allows Daniel to join in Elias's arguments, not to create new ones that Elias and he omitted from their respective opening briefs. Second, to the extent Daniel seeks to raise the arguments for the first time in his reply, they are forfeited. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218.) Absent a showing of good cause (and here there is none), fairness considerations preclude considering arguments raised for the first time in a reply brief. (*Ibid.*)

The arguments are also meritless. As to the issue of premeditation and deliberation, in the Letter, Daniel asserts: There was "no evidence of Daniel being armed with a weapon prior to the shooting. Instead, the prosecutor's theory was that Elias had the firearm before the shooting." These statements are ambiguous insofar as Daniel fails to define what he means by "prior to

113

the shooting." Although it is true Elias was photographed with a weapon at some point "prior to the shooting," this does not negate the fact that Daniel, too, was armed with a weapon immediately before and during the shooting. Daniel was the shooter. He confessed to the CI that he shot and killed Annebell with a "fuckin' .22" and that Elias was *not* armed. The People offered very thin evidence—a .38 slug found in someone's shoe—to support a theory that Elias was *also* armed at the time of the shooting.[37] But the People *never* claimed that Elias was armed during the incident while Daniel was not. Regarding the challenge to the sufficiency of the evidence for the gang enhancements, we have explained above why that argument lacks merit.

---

[37] The day after the shooting, a resident near the Park found a bullet hole in his front door and a .38 or .357 Magnum round that had landed inside the house in an empty shoe. In opening statement, the prosecutor told the jury "[t]he evidence will suggest the possibility" that Elias fired this round and missed. However, by the end of the trial, the People abandoned this theory. In closing argument, the prosecutor told the jury, "[T]he only fear I really have is that you're going to get hung up, real hung up, on whether Elias had a gun and fired or not and you'll spend . . . time on that issue. [¶] Just remember this, if you start to get hung up on that, it's not charged that way. It's not charged for you to have to find whether Elias Ramos fired a gun or not; right? So that's not a decision you have to make."

O.    *Due to Recent Amendments to Section 186.22, the True Findings on the Gang Enhancements in Counts 1, 2, and 3 for Both Daniel and Elias Must Be Reversed, Along with the Sentence Imposed on Elias for the Firearm Enhancements in Counts 1 and 2, and the Increase to the Sentence on Count 2 for Daniel, All of Which Were Predicated on the True Findings on the Gang Enhancements*

The jury made true findings on gang enhancements under section 186.22, subdivision (b)(1) for counts 1, 2, and 3 for both Daniel and Elias.[38] Those true findings led to the following components of the sentences imposed by the trial court.  First, for Daniel, the trial court (1) imposed a sentence of four years for the gang enhancement in count 3; and (2) increased the sentence on the attempted murder count from a term of seven years to life to a term of 15 years to life based on the gang enhancement in section 186.22, subdivision (b)(5).[39]  Second, for Elias, the trial court (1) imposed a sentence of four years for the gang enhancement in count 3; (2) used the true finding on the gang enhancement in count 1 as a predicate to impose the firearm enhancement of 25 years to life in count 1 (§ 12022.53, subds. (d), (e)(1)); and used the true finding on the gang enhancement in count 2 as a predicate to

---

[38]    As we have noted, that enhancement applies when the jury finds that the defendant committed a felony "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)

[39]    Section 186.22, subdivision (b)(5) provides that, with certain exceptions, "a person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

115

impose the firearm enhancement of 20 years in count 2 (§ 12022.53, subds. (c), (e)(1)).[40]

Effective January 1, 2022, Assembly Bill No. 333 made a number of substantive amendments to section 186.22. (Stats. 2021, ch. 699, §§ 1-5 (Assembly Bill 333).) With respect to section 186.22, "Assembly Bill 333 made the following changes . . . : First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by

---

[40] Section 12022.53, subdivision (e)(1) makes the firearm enhancements in subdivisions (b), (c), and (d) applicable to someone who is a *principal* in a crime, *but not the shooter*, if the jury makes a predicate true finding on the gang enhancement in section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1) ["The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)"].) The jury made true findings under section 12022.53, subdivision (e)(1) as to both Daniel and Elias on counts 1 and 2. However, with respect to Daniel, the jury also made true findings based on section 12022.53, subdivisions (c) and (d), which were based on Daniel being the shooter. The enhancements under those subdivisions as to Daniel did not require a predicate true finding on the gang enhancement.

two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*Tran, supra,* 13 Cal.5th at p. 1206.)

Daniel and Elias argue, and the People agree, that the amendments to section 186.22 apply retroactively here because the convictions are not yet final. We concur with the parties' position on the retroactivity of the substantive changes to section 186.22, which is supported by our Supreme Court's recent decision in *Tran.* (*Tran*, *supra*, 13 Cal.5th at p. 1206.)

The jury instructions did not reflect the current requirements set forth in the amended version of section 186.22. As the People explain, the jury instructions "permitted true findings for the gang enhancements upon evidence that satisfied the former version of the statute. . . . These retroactive instructional errors included the authorization to use a current crime to establish a pattern of criminal gang activity . . . and the failure to require the jury to consider whether, for example, Center Street was an 'organized association' whose members derived a 'common benefit' that was 'more than reputational' (see . . . § 186.22, subd[s]. (f), (g)). Jury instructions regarding the former elements and the permission to consider the current charges were appropriate at the time of trial but are now error."

With respect to whether the use of now-erroneous jury instructions requires reversal, the applicable case law requires us to apply the standard set forth in *Chapman, supra,* 386 U.S. at page 26. Specifically, as the parties agree, we must reverse the true findings on the gang enhancements unless

117

we conclude, beyond a reasonable doubt, that the now-erroneous instructions did not contribute to the true findings on the gang enhancements. (*Tran*, *supra*, 13 Cal.5th at p. 1207 [applying the *Chapman* standard to determine that the application of the prior version of § 186.22 was prejudicial].)

The People concede that the error was prejudicial and requires reversal. We agree that reversal is required. Among other things, based on the jury instructions and the evidence presented at trial, we cannot conclude beyond a reasonable doubt that the jury's finding that the gang engaged in a pattern of criminal activity was not based, at least in part, on the currently charged offenses. (§ 186.22, subd. (e)(2).) Further, we cannot conclude beyond a reasonable doubt that the jury would have found that the benefit the gang derived from the predicate offenses was "more than reputational." (§ 186.22, subd. (g).)

We will therefore reverse the true findings on the gang enhancements as to both Daniel and Elias in counts 1, 2, and 3. As a result, the components of Daniel and Elias's sentences that relied on the true findings on the gang enhancements must also be vacated. These include: (1) for both Daniel and Elias, the four-year sentence for the gang enhancement in count 3; (2) for Elias, the firearm enhancement of 25 years to life in count 1 (§ 12022.53, subds. (d), (e)(1)) and the firearm enhancement of 20 years in count 2 (§ 12022.53, subds. (c), (e)(1)); and (3) for Daniel, the increase to the sentence on the attempted murder count from a term of seven years to life to a term of 15 years to life (§ 186.22, subd. (b)(5)).[41]

---

[41]   For Daniel, the jury also made true findings in counts 1 and 2 on firearm enhancements based on section 12022.53, subdivision (e)(1). Those true findings must be reversed as a result of the reversal of the true findings on the gang enhancements. (§ 12022.53, subd. (e)(1) [requiring a finding that

The People may choose on remand to retry the gang enhancement allegations for both Daniel and Elias based on the current version of section 186.22. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 669; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128 (*Ramos*).) If the People obtain true findings on the gang enhancements on remand, the true findings on the firearm enhancements in counts 1 and 2 under section 12022.53, subdivision (e)(1) may be reinstated by the trial court, as the necessary predicate of a true finding of a violation of section 186.22, subdivision (b) will once again exist for those firearm enhancements. (§ 12022.53, subd. (e)(1)(A) [requiring a finding that "[t]he person violated subdivision (b) of Section 186.22."].)

P. *The New Statute Permitting Defendants to Obtain Bifurcation of Gang Enhancements, Whether or Not Retroactively Applicable, Does Not Require Reversal Because Daniel and Elias Cannot Establish Prejudice*

Effective January 1, 2022, in Assembly Bill 333 the Legislature enacted section 1109, which provides that, upon a defendant's request, the trial of gang enhancements must be bifurcated from the trial of substantive offenses. (§ 1109, subds. (a) & (b), added by Stats. 2021, ch. 699, § 5.) Specifically, section 1109 states, in relevant part, "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of

---

the defendant "violated subdivision (b) of Section 186.22"].) However, Daniel's sentence will not be impacted because, for Daniel, the trial court imposed terms of imprisonment for the firearm enhancements in counts 1 and 2 under section 12022.53, subdivisions (c) and (d), which were not predicated on any true finding on a gang enhancement.

Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a).)[42]

Daniel and Elias argue that the bifurcation requirement created by section 1109 applies retroactively to convictions, like theirs, that are not yet final. Daniel and Elias further argue that the failure to bifurcate requires that we reverse the *entire* judgment so that they may be tried in a bifurcated proceeding, in which the jury will first deliver a verdict on the substantive charges without being exposed to the evidence relating to the gang enhancements. The People disagree on both points.

As our Supreme Court has recently noted, case law is split on the question of whether section 1109 applies retroactively to convictions that are not yet final. (*Tran, supra,* 13 Cal.5th at p. 1208.) Some published opinions have held that section 1109 is not retroactive. (*Ramirez, supra,* 79 Cal.App.5th at p. 65 [majority holding § 1109 is not retroactive; concurrence holding it is retroactive], review granted; *Perez, supra,* 78 Cal.App.5th at p. 207, review granted.) Other published opinions have held that section 1109 is retroactive. (*Burgos, supra,* 77 Cal.App.5th at pp. 564-569, review granted [majority holding § 1109 is retroactive; dissent holding it is not retroactive]; *Ramos, supra,* 77 Cal.App.5th at pp. 1128-1130; *Montano, supra,* 80 Cal.App.5th at pp. 89, 108.) The issue of whether section 1109 applies retroactively to nonfinal cases is currently pending

---

[42]   Prior to the enactment of section 1109, the trial court had discretion to bifurcate the trial of gang enhancements. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) Here, the trial court denied the defendants' motion to bifurcate the underlying charges from the gang enhancements, stating that "the gang evidence is directly related to the crime. It goes to motive and intent."

before our Supreme Court, as it is considering the issue in its review of *Burgos*.

In *Tran*, our Supreme Court found it unnecessary to take a position on whether section 1109 applies retroactively to convictions that are not yet final, as any error in failing to bifurcate the trial of the gang allegations was harmless. (*Tran*, *supra*, 13 Cal.5th at p. 1208.) As we will explain, we take the same approach here. Even assuming, without deciding, that section 1109 applies retroactively, the failure to bifurcate the trial of the gang allegations was harmless error.

In their briefing filed prior to our Supreme Court's issuance of *Tran,* Daniel and Elias argued that the failure to bifurcate the trial of the gang enhancements constituted structural error that is not amenable to harmless error review and is therefore reversible per se. However, as Daniel and Elias concede in supplemental letter briefing, that position is no longer tenable after *Tran*. (*Tran*, *supra*, 13 Cal.5th at p. 1208 [rejecting the appellant's "contention that the failure to bifurcate constitutes structural error"].)

In most instances, when an error is one of state law, reversal is not warranted unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*Watson*, *supra*, 46 Cal.2d at pp. 836-837; *People v. Lewis* (2021) 11 Cal.5th 952, 973 ["Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.' "].) The now-existing requirement to bifurcate gang enhancements arises from a state-law statute (§ 1109), and a failure to follow section 1109 therefore constitutes an error of state law.

As *Tran* recognized, certain errors of state law may require the application of the *Chapman* harmless error standard (*Chapman*, *supra*, 386 U.S. at p. 26) if they rise to federal constitutional error under the due

121

process clause by rendering the trial fundamentally unfair. (*Tran*, *supra*, 13 Cal.5th at p. 1209, citing *People v. Partida* (2005) 37 Cal.4th 428, 439.) However, like the appellant in *Tran*, Daniel and Elias have not persuaded us that the failure to bifurcate the gang enhancements created a fundamentally unfair trial within the meaning of the federal due process clause. (*Id.* at p. 1209 [holding that "the prosecutor's use of the gang evidence here did not render the trial 'fundamentally unfair' "].) The trial was not fundamentally unfair due to the failure to bifurcate because, as we explain below, most of the gang evidence presented at trial was relevant to the substantive offenses, and the limited amount of evidence relevant only to the gang enhancements was not particularly inflammatory. (See *Albarran*, *supra*, 149 Cal.App.4th at p. 229 [" 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." ' "].)

As in *Tran*, having rejected the contention that the failure to bifurcate the gang allegations rendered the trial fundamentally unfair, we apply the *Watson* harmless error standard. (*Tran*, *supra*, 13 Cal.5th at p. 1209.) Under that standard, we conclude that there is no reasonable probability of a different outcome were the gang enhancements to be bifurcated from underlying offenses. This is because the vast majority of the gang-related evidence was relevant to prove the underlying offenses and thus would have been presented to the jury *even if* the trial of the gang enhancements was bifurcated. Indeed, as our Supreme Court has explained, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive,

122

modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez, supra*, 33 Cal.4th at p. 1049.) That was clearly the case here.

Specifically, the prosecution's theory was that Daniel and Elias entered rival gang territory and shot in a premeditated manner in an attempt to kill perceived rival gang members. The gang-related evidence, including Elias's rap videos and Daniel's lengthy conversation with the CI, whom he perceived to be a fellow gang member, as well as evidence about the background of the rivalry between the Center Street and Posole gangs, and the customs and codes of behavior of gang members, was centrally relevant to the People's case on the underlying counts. Although it is true, as Daniel states, that the jury heard "a panoply of incriminating gang evidence," almost all of that evidence was admissible to prove motive, identity and premeditation for the underlying counts. Indeed, as Daniel observes in his briefing, the gang evidence "played a large role in setting up the state's theory that Daniel was guilty of premeditated and deliberate first-degree murder and attempted murder."

Neither Daniel nor Elias have identified the evidence that they think was admitted *only* because of the gang enhancements. Based on our review of the record, only a small fraction of the gang-related evidence admitted at trial was relevant *solely* to prove the gang enhancements, with no substantial relation to the issues of identity, motive, or premeditation. That evidence primarily consisted of the testimony about the six predicate offenses committed by Center Street gang members. However, as we have explained, that evidence was presented in a cursory and sanitized manner. (See pt. II.F.2, *ante*.) It is not reasonably probable that the outcome of the trial on the substantive counts would have been different in the absence of that brief

and non-inflammatory evidence.  In addition, the jurors were instructed that they "may not conclude from [gang] evidence that the defendant is a person of bad character or that he has a disposition to commit crime."  We presume that the jurors followed the court's instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  Finally, it is not reasonably probable that Daniel and Elias would have obtained a different outcome at trial if the evidence attributable solely to the gang enhancements was excluded, as that minimal evidence pales in comparison to the strong evidence of guilt in this case.  As we have explained, Daniel confessed to a deliberate and premeditated murder, and he also named Elias as an aider and abettor.[43]

In sum, even assuming section 1109 is retroactively applicable in this case, the failure to bifurcate the trial of the gang enhancements was not prejudicial error.[44]

---

[43]     In another attempt to establish prejudice, Daniel argues that if the trial of the gang enhancements was bifurcated, "[t]he trial court's weighing of prejudicial effect against probative value under Evidence Code section 352 would necessarily have been different, because the court would have weighed the prejudicial effect of the evidence against its probative value with respect to the elements of the underlying crime, not its probative value with respect to the elements of the gang enhancement."  We are not persuaded.  Given the direct relevance of the vast majority of the gang evidence to prove identity, motive, and premeditation, it is not reasonably likely that the trial court would have decided to exclude that evidence under Evidence Code section 352 if its probative value with respect to the gang enhancements was absent.

[44]     Moreover, based on the strength of the evidence of the defendants' guilt and the minimal gang-related evidence relating solely to the gang enhancements, even assuming without deciding that it was error not to bifurcate the gang enhancements, any such error does not change our conclusion that the cumulative errors committed by the trial court do not require reversal.

Q. *The Upper Term Sentences on Count 3 Must Be Vacated and Defendants Must Both Be Resentenced on That Count Based on the Recent Amendments to the Determinate Sentencing Law*

Effective January 1, 2022, the determinate sentencing law set forth in section 1170 was amended. (See Sen. Bill No. 567 (2021-2022 Reg. Sess.); Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2021-2022 Reg. Sess.); Stats. 2021, ch. 695, § 5.) Those amendments are relevant here in two respects.

First, under the amended statute, a court must "order imposition of a sentence not to exceed the middle term," except in limited circumstances. (§ 1170, subd. (b)(1).) A court may depart from the presumptive middle term to impose an upper term sentence "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (b)(2).) Nevertheless, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (*Id.*, subd. (b)(3).) Here, in count 3, for the conviction of possession of a firearm by a felon (§ 29800, subd. (a)(1)), the trial court imposed upper term sentences on both Daniel and Elias.[45] In so doing, it relied on several aggravating

---

[45] The trial court also imposed upper term sentences on both Daniel and Elias for the gang enhancements in count 3. However, as we have explained, those sentences will be vacated due to the statutory amendments to section 186.22. We accordingly do not include them in our discussion here.

factors based on the defendants' criminal history.[46]  However, the trial court may have based its understanding of Daniel and Elias's criminal history on the description set forth in the probation officer's reports, rather than on certified records of conviction, as prior to the amendments to section 1170, there was no reason for the People to submit certified records to establish factors in aggravation.

Second, the amended statute now includes a presumption in favor of the lower term sentence when, among other things, a defendant is under 26 years of age at the time of the offense or when past trauma was a contributing factor to the commission of the offense.  (§ 1170, subd. (b)(6).)  "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the

---

[46]    For Elias, the trial court stated, "Factors in aggravation under Section 4.421 include that the defendant's prior juvenile and adult convictions are numerous and that this is his third conviction for unlawful possession of weapons, the second for a firearm, as shown by the probation report.  He was on felony probation at the time of this crime.  And his prior performance on adult probation was unsatisfactory."  For Daniel, the trial court stated, "Factors in aggravation under 4.421 include his prior juvenile adjudication, and adult convictions are numerous.  And this is his third conviction for unlawful possession of a firearm.  He was on felony probation for possession of a firearm at the time of this crime, and his prior performance on probation has been unsatisfactory."  The trial court did not identify any factors in mitigation for either of the defendants.

126

offense. . . ." (§ 1170, subd. (b)(6); see § 1016.7, subd. (b) ["A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed"].)  Here, both Daniel and Elias were under 26 years of age when they committed the offenses.  Further, Daniel and Elias both contend they suffered childhood trauma.  Because the trial court sentenced Daniel and Elias prior to the amendments to the determinate sentencing law, it did not consider whether a lower term sentence should be imposed in count 3 based on either of those factors.

Daniel and Elias argue that they are entitled to have the newly amended law applied to them, as their convictions are not yet final.  The People properly agree that the amendments to section 1170 apply retroactively to Daniel and Elias.  (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 ["The People properly concede that Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022."].)

The People also concede that the application of the prior version of the determinate sentencing law was prejudicial.  Specifically, relying on the statutory amendment creating a presumptive lower term sentence for youthful offenders, the People explain that "the trial court had no opportunity to consider the new potentially mitigating factors under . . . section 1170, subdivision (b)(6).  A remand for resentencing on count 3 for both appellants is appropriate."  We accept the People's concession.  The trial court should have the opportunity, in the first instance, to consider whether a lower term sentence should be imposed, and the record does not indicate how the trial court will choose to exercise that discretion.

We accordingly vacate the sentences imposed on Daniel and Elias for count 3, and we remand for the trial court to apply the amended version of the determinate sentencing law for that count.

R. *On Remand, the Trial Court May Consider Whether to Impose Lesser Uncharged Firearm Enhancements*

As we have explained, one of the components of the sentences for both Daniel and Elias were firearm enhancements pursuant to section 12022.53. (§ 12022.53, subds. (c), (d), (e)(1).) Section 12022.53, subdivision (h) provides that a "court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." Our Supreme Court held in *Tirado* that a trial court has the discretion under this provision to strike a greater, charged section 12022.53 enhancement and impose a lesser, uncharged enhancement where the facts supporting that lesser enhancement were alleged in the information and found true by the jury. (*Tirado, supra*, 12 Cal.5th at pp. 697, 700.)

Here, because the trial court pronounced sentence prior to our Supreme Court's decision in *Tirado, supra*, 12 Cal.5th 688, there is no indication it understood its discretion to impose a lesser firearm enhancement. Because we are remanding for a full resentencing, the trial court shall have the opportunity, on remand, to decide whether to exercise the discretion identified in *Tirado*. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 (*Buycks*) ["[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' "]; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant."].)

128

The sentencing discretion identified in *Tirado*, *supra*, 12 Cal.5th 688, could possibly impact the sentences for the firearm enhancements under counts 1 and 2 that remain as to Daniel (§ 12022.53, subds. (c), (d)), as well as any firearm enhancements alleged against Elias that may be reinstated in the event the People successfully retry the gang enhancements.[47]

S.   *Issues Involving Fines and Fees*

At sentencing, the trial court ordered Daniel and Elias to pay the following:  (1) a restitution fine under section 1202.4, subdivision (b) of $10,000; (2) $7,496.33 in victim restitution (Annebell's funeral expenses); and (3) other court fees totaling $364, including a criminal justice administration fee of $154 pursuant to former Government Code section 29550.1.

1.   *The $154 Criminal Justice Administration Fee Must Be Vacated to the Extent It Has Not Yet Been Paid*

As of July 1, 2021, the statutory provision pursuant to which the trial court imposed the $154 criminal justice administration fee was repealed. (Stats. 2020, ch. 92, § 24; Assem. Bill No. 1869 (2019-2020 Reg. Sess.).) Effective July 1, 2021, Assembly Bill No. 1869 amended Government Code section 6111, which now provides, "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . [Government Code] [s]ection 29550, and [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any

---

[47]   Although the People contend that the record shows there is no possibility the trial court will exercise its discretion to impose lesser firearm enhancements on Daniel, we need not address that issue, as we are remanding for a full resentencing.  (*Buycks*, *supra*, 5 Cal.5th at p. 893.)  On remand the trial court will have the opportunity to consider, in the first instance, whether the sentencing discretion identified in *Tirado*, *supra*, 12 Cal.5th 688, impacts its view of the appropriate sentence for Daniel on the firearm enhancements.

portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)  Pursuant to Government Code section 6111, the unpaid balance of the criminal justice administration fee, as of July 1, 2021, is unenforceable and uncollectible.  (*People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)  We therefore vacate any balance of the $154 fee imposed on both Daniel and Elias that remains unpaid as of July 1, 2021.

2.  *On Remand for Resentencing, the Parties May Raise the Issue of Their Inability to Pay the Remaining Fines and Fees*

Daniel and Elias contend the court erred in imposing fines, fees, and assessments without first conducting an ability-to-pay hearing as described in *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  Our Supreme Court is currently considering the issues raised in *Dueñas*.  (*People v. Kopp* (2019) 38 Cal.App.5th 47, 94, review granted Nov. 13, 2019, S257844.)

Although Daniel and Elias did not raise the issue of their ability to pay the fines and fees at sentencing, because we are remanding for a full resentencing, they may raise that issue for the first time on remand.  The issue is therefore not ripe for our consideration.

## DISPOSITION

We reverse the true findings on the gang enhancement allegations (§ 186.22, subd. (b)) for both Elias and Daniel in counts 1, 2, and 3, along with the corresponding four-year sentences for both of them in count 3.  The People may choose to retry those allegations on remand.  As to Elias, we reverse the true finding on the firearm enhancements and the corresponding sentence of 25 years to life in count 1 and 20 years in count 2.  On remand, if the People retry the gang allegations as to Elias on counts 1 and 2 and obtain a true finding on those allegations, the trial court may reimpose the firearm enhancements on Elias pursuant to section 12022.53, subdivision (e)(1) in counts 1 and 2.

130

Daniel and Elias's sentences are vacated and this matter is remanded for a full resentencing. In addition to the gang enhancements for both Daniel and Elias in counts 1, 2, and 3, and the firearm enhancements for Elias in counts 1 and 2, as stated above (along with the corresponding sentences), the following components of the trial court's sentence are not legally permissible based on the current record: (1) For both Daniel and Elias: (a) the upper term three-year sentence on count 3; and (b) the $154 fee imposed under former Government Code section 29550.1, to the extent it remains unpaid; and (2) for Daniel: the 15-year-to-life sentence on count 2, which must be reduced to a sentence of seven years to life, absent a legally permissible finding on the gang enhancement allegation as to Daniel in count 2 on remand. As part of a full resentencing hearing, the trial court may also consider with respect to the firearm enhancements, whether to exercise its discretion to impose lesser firearm enhancements.

In all other respects, the judgments are affirmed.


IRION, J.

WE CONCUR:



HUFFMAN, Acting P. J.



BUCHANAN, J.


131